**AMERICAN LITTORAL SOCIETY, Audubon Society of Everglades, Coral Reef Society, Save & Protect our Acquatic Resources & Environment, Sierra Club, Norine Rouse, John Kordisch, Jack C. Dilgen, William J. Turbeville, Donald Koller, Mark Roman, Stuart Shulman, Plaintiffs,**

v.

**Col. Robert T. HERNDON, District Engineer, U.S. Army Corps. of Engineers, Lt. Gen. E.R. Heiberg, II, Maj. Gen. Ernest Edgar, III, and City of Boca Raton, Defendants.**

No. 88–8144–CIV.

United States District Court,
S.D. Florida,
West Palm Beach Division.

June 10, 1988.

Kenneth W. Lipman, Boca Raton, Fla., Jonathan L. Shepard, Howard I. Fox, Eric P. Jorgensen, Sierra Club Legal Defense Fund, Washington, D.C., for plaintiffs.

Office of U.S. Atty., Miami, Fla., Stephen Samuels, Land and Natural Resources Div., Environmental Defense Section, Washington, D.C., John Brady, U.S. Army Corps. of Engineers, Jacksonville, Fla., Alfred J. Malefatto, West Palm Beach, Fla., for defendants.

## ORDER DENYING PRELIMINARY AND PERMANENT INJUNCTION

ROETTGER, District Judge.

### PREFACE

Various environmental groups and individuals filed suit against the Army Corps of Engineers, Secretary of the Army and the City of Boca Raton seeking to block the permit for the beach nourishment project on a portion of Boca Raton's north beach. Plaintiffs have no quarrel with the City's having expended funds for the mitigation aspects of the permit and the mitigation portion of the permit has been completed at a substantial cost to the City.

Plaintiffs contend that the permit violates the Endangered Species Act because it requires construction during the months of June, July and August, the nesting season for two species of endangered sea turtles and one threatened species. The federal permit conforms to the state permit's insistence that the construction be during the summer months only.

The Plaintiffs also contend that the act violates the Clean Waters Act. Plaintiffs seek determination that the beach nourishment project violates NEPA and Plaintiffs also seek the declaration of the Corps that the permit violates the Coastal Zone Management Act.

The parties have stipulated, pursuant to Fed.R.C.P. 65, that matters be considered on the extensive record without the necessity for evidentiary hearing and that the matters presented at the preliminary junction be consolidated with the permanent injunction considerations, as well.

After a brief chronology of events, detailed discussion of the issues raised at hearing is set forth.

### CHRONOLOGY OF SIGNIFICANT EVENTS

In 1985, the City of Boca Raton completed a somewhat similar beach nourishment project .6 mile in length near the south end of its 5+ miles beach basically utilizing the same techniques; the project was completed during the month of June, apparently

without opposition from Plaintiffs herein or other groups.

On November 21, 1986, the Florida Department of Environmental Regulations, (DER), issued a permit to the City of Boca Raton (hereinafter "CITY") for a beach restoration project in the northern part of the beach. A final order of dismissal of a prior dispute was entered the same day. Specific condition # 3 of the DER permit restricts project construction to the months of June, July and August. Previously, various procedural steps were involved on the project. For example, on May 1, 1985, the Corps of Engineers circulated its draft GDM (General Design Memorandum) and draft EIS (Environmental Impact Statement) to various agencies and organizations, including Plaintiffs Sierra Club and the Audubon Society. Comments were submitted by various federal and state agencies on the drafts, however nothing was offered by Plaintiffs in the instant case. The final GDM and EIS were published by the Corps of Engineers in April of 1987.

The City applied for a permit from the Corps under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act in December, 1984 and at the same time filed a permit application with the Florida Department of Environmental Regulations (DER) pursuant to state requirements. DER approved the permit in November of 1986 authorizing the construction of a beach 100 to 125 feet wide along a 1.45 mile stretch with 980,000 yards of sand dredged from a "borrow" area located approximately 2500 feet offshore. Because of its concerns about turbidity, DER limited City's beach nourishment activity to the months of June, July and August only. Additionally, DER required the City to construct a groin to protect the Red Reef Rock formation and to construct six artificial reef modules, each consisting of 25 natural limestone boulders as mitigation for the loss of nearshore limestone rocks that would be covered by the beach nourishment project. After DER's permit was issued, the City submitted a modified permit application to the Corps that reflected the conditions of the state permit.

As found by the State DER examiner, in May of 1987 the City had requested the three month construction restriction of DER be deleted completely from the permit. (At that time the City hoped to begin construction of the project in the fall of 1987 to avoid construction during the sea turtle nesting session, but otherwise still within the terms. DER's hydragraphic engineer, Dr. Echternacht, opposed the request to delete the construction time limitation period. Because of the delays in the federal permitting process, the City withdrew the earlier modification requests.)

On September 2, 1987, a public hearing was held by the Corps on City's "dredge and fill" permit application for a 1.45 mile, 100 to 120 feet wide project. Testimony was received from many witnesses, including several of Plaintiffs, and Plaintiffs' witnesses.

In October, 1987, the U.S. Fish & Wildlife Service (FWS) issued its biological opinion with several reasonable and prudent measures, which must be implemented or the incidental take of the sea turtles "is not authorized". As measure # 1: "... beach nourishment should be conducted before May 30th or after October 5th (preferably before May 1st or after October 31st)."

On November 12, 1987, the Corps issued a statement of findings regarding the City's permit application discussing comments of various agencies, organizations and individuals plus discussion of practicable alternatives in the impacts and 16 separate factors involving the public interest, including economics, esthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, land use, shore erosion and accretion, recreation, water quality, safety, Corps wetland policy, mitigation, cumulative impacts, and endangered species.

The conclusion of the statement of findings of the Corps was that "the issuance of the permit [for the project] is not contrary to public interest".

Further meetings were held between the Corps of Engineers and FWS in an effort

to avoid any encroachment of the project with sea turtle nesting and if that was unavoidable, to expand nest protection efforts to insure earliest relocation of nests in order to achieve maximum hatching success. See letter of December 22, 1987 from FWS to the District Engineer (Defendant Boca's Exhibit 41).

In December of 1987, the City's former "self-releasing hatchery" was lost due to erosion of the beach.

EPA initially opposed the Corps decision pursuant to its authority under the Clean Water Act, based on its perceived benefits of the near-shore rock outcroppings that would be covered by the project. Assistant Secretary of the Army for Public Works sent a letter to EPA supporting the determination that the near-shore rocks were not environmentally or ecologically significant.

On January 28, 1988, the acting Regional Administrator for EPA for Region 4 concluded that the proposed project did not present an unacceptable adverse effect necessitating the exercise of EPA's veto authority under Section 404(c) of the Clean Water Act. The Corps granted the City's permit application on the same day. The work authorized by the Corps' permit corresponds with the project approved by Florida DER. Also consistent with the state permit the Corps permit limited project activity to the months of June, July and August.

By letter dated February 12, 1988, the FWS requested the City to seek a modification of its DER permit to allow construction of the project to begin on May 1, 1988. The FWS's concern was that the modification was important to avoid conflict with the peak nesting season of sea turtles, which are protected species.

On February 22, 1988, the City applied to DER by letter for the suggested permit modification; with the additional data Dr. Echternacht of DER supported a permit modification which would allow the construction period to begin in March of 1988.

On March 10, 1988, DER indicated its intention to grant the modification finding "that the proposed modification is not ex-

pected to result in any adverse environmental impact or water quality degradation...."

On March 22, 1988, the American Littoral Society's South Florida Chapter and the Sierra Club's Florida Chapter jointly (both Plaintiffs herein), as well as the Coral Reef Society, filed virtually identical petitions objecting to DER's proposed approval of construction earlier than the summer months with a modification request; each requested a formal administrative hearing. On April 8, 1988, the issue was narrowed to whether DER's proposed approval of the modification, expanding the construction "window" by one month was proper.

On March 25, 1988, counsel for some of Plaintiffs sent a notification letter and threatened litigation.

On March 30, 1988, the instant litigation was commenced.

On April 1, 1988, the City sent a letter to FWS documenting in detail its extensive plans and willingness to comply with the reasonable and prudent measures required by FWS in its October, 1987 biological opinion.

On April 20, 1988, the FWS advised the City in response to its April 1st letter, that

"in the event litigation, weather, or equipment breakdowns require activity to continue into June, it will be necessary to implement an alternative procedure to minimize the impact on nesting turtles. The FWS recommends that, if it becomes necessary to conduct nourishment activities after June 1, 1988, hourly nighttime beach patrols during the entire nesting season be implemented. Hourly nighttime surveys and nest relocation of the secure hatcherey will virtually insure that no nests are moved and therefore avoid any incidental take.... This will also enhance hatching success."

FWS's letter further advised that if the City implements the alternative stated there, the City would be in compliance with the Endangered Species Act.

On May 3, 1988, the hearing officer recommended that a final order be entered granting the permit modification to the

City and rejecting the petitions of Plaintiffs in opposition to the modification.

On May 16, 1988, the recommended order of the hearing examiner was adopted *in toto* by Secretary of Department of Environmental Resources, granting the permit modification request.

On May 24, 1988, briefs of the Defendants were filed in the instant case and on May 25, 1988 a hearing was held in West Palm Beach by the undersigned.

On May 27, 1988, a conference call follow-up hearing was held with all counsel.

On May 31, 1988, following the Memorial Day weekend, a tour to view the beach was made by the judge, with counsel notified and present, to observe the actual beach site and possible erosion occurrences.

The court will address the three basic issues that were argued at the hearing: (1) whether, under the permit, the disturbance of the sea turtle nesting during the months of June, July and August violates the Endangered Species Act; (2) whether the Corps of Engineers failed to consider adequately the impact on recreation and (3) whether a 25 foot width beach was a practicable alternative and did the Corps of Engineers consider it in making its decision.

## DISTURBANCE OF SEA TURTLE NESTING

■ The beach nourishment project covered by the permit in the instant case is for 1.45 miles of the City's 5 + mile-long beach. Boca Raton has maintained an 11–year survey of its sea turtle nesting and the following statistics apply to the three sea turtle species involved: the loggerhead, the green and the leatherback. An average of 333 loggerhead sea turtles have nested in the area annually while during the 11 year monitoring period an average of only 2.3 leatherback and 8.7 green sea turtles nested on the beach each year. (Wolf Affidavit, Paragraph 7, and DER findings, Paragraph 9.)

The Boca Raton Sea Turtle Conservation Program was initiated in 1977 and the City's Chief Environmental Officer, Richard Wolf, has supervised it since that time.

His extensive background and duties are set forth in his Affidavit and the steps taken by the City to implement its turtle protection program are set forth in great detail (Paragraph 5 et seq.) For example, there are 15 persons properly trained and included under Florida Department of Natural Resources permit participating in the Sea Turtle Protection Program. The monitoring, locating and, if necessary, removing of nests is described in detail in the Affidavit.

The City of Boca Raton Sea Turtle Preservation Program has received both state and national recognition. For example, the Center for Environmental Education in Washington, D.C. has used the City's program as a model for other communities wishing to start their own sea turtle conservation programs. Boca Raton's sea turtle conservation program has received recognition in *Defenders of Wildlife* Magazine. The Florida Department of Natural Resources has stated that Boca Raton has one of the best sea turtle protection programs in the State of Florida and has used the City's program as a model for other Florida cities.

## BEACH EROSION AND ITS EFFECTS

Because erosion—or the lack of it, depending on the parties' point of view—was an issue in the case and the parties had made various assertions and counter-assertions about beach erosion, but had not furnished the court with pictures or exhibits in that regard, the court felt it necessary to have a "judge's view" of the beach.

This court toured the beach with counsel and was able to inspect and observe first-hand the City's claim of a handicapped facility allegedly destroyed by erosion and another one claimed to be in peril of damage.

Additionally, the court could inspect where the beach turtle egg hatchery had been and the present location after the older beach hatchery had been destroyed in December of 1987 by wave action. Additionally, the court could inspect, and did, the erosion problem as it's affecting beach-

side trees growing in the dune at the north beach area near Spanish River Park.

The court finds that the project area's beach has been eroding seriously in recent years.[1] Specifically, one handicapped facility (a concrete "platform" area for wheelchair occupants to enjoy the beach and ocean view) has been destroyed and another is in danger of it. This is, of course, in addition to the severe loss of beach width and the beach hatchery.

The city statistics on sea turtle nests in the north beach area strongly corroborate the court's finding, as in recent years the City has relocated, necessarily, sea turtle nests that were threatened by tidal activity. Wave action poses two problems to sea turtle nests: the washing of the nests out to sea or inundation of them, thereby "drowning" or greatly increasing the mortality rate of the eggs. Because of the erosion of the beaches in the north beach area, more and more sea turtle nests each year have been laid below the mean high water line, requiring more and more nests to be relocated.

For example, in 1985 106 sea turtle nests were destroyed by storm activity and erosion of the 314 nests (34%) deposited on Boca's north public beaches. During 1986 on the same beaches, 185 of the 327 nests (57%) were relocated to provide greater protection (FWS biological opinion, page 4, dated October 9, 1987.)

These figures contrast with the fact that 70% of the nests laid in 1987 at the north Boca beaches had to be relocated because of locations threatened by wave activity or tidal inundation. This pattern predicts even higher relocation percentages for relocation if the beach is not restored quickly.

There has been a census made of turtle nesting this spring and as of May 15, 1988, there have been 15 loggerhead nests and one leatherback nest laid on the north 2.6 miles of the City's public beaches. Of those 16 nests, a total of 7 have been laid in the 1.45 mile project area; *all* of these nests had to be relocated to the hatchery because they were threatened by destruction due to wave activity or tidal inundation.

The City's hatch rate from relocated sea turtle nests has been highly successful over the years. For example, the successful hatching rate in 1987 was 78.3% for all relocated loggerhead eggs compared to the 78.6% survival percentage of hatchlings for nests left in their natural location on the beach. The court finds this reassuring because it indicates that the City's protected hatchery and relocation procedures are being carried out with skill and attention to detail.

### EFFECT OF BEACH NOURISHMENT IN 1985

Boca Raton conducted a beach restoration project in a portion of the City's south beach in 1985. Although there are some differences between that restoration project and the proposed nourishment project, the south Boca project resulted in a beach with approximately 100 feet berm width sloping gradually down to the mean high water line and beyond. This project was completed in June of 1985 and is 6/10ths of a mile in length. Fortunately, the City has monitored sea turtle nesting at the south beach since 1985, although no

---

**1.** Subsequently filed photos of the beach are not, as the court feared, very helpful, because the difference between photos taken with a zoom lens and a wide-angle lens vary greatly in how they depict the scene; additionally, it's impossible to tell whether it's high tide or low tide although the seaweed mark is some clue.

The Court's view of the beach, although made in less than ideal weather conditions, was most revealing; it took about one hour to one-and-a-half, covered various places on the beach, as well as the projectd area and the beach hatchery. It was neither high tide nor low tide but approaching low tide. The Court was shocked at the erosion and beach loss of the splendid

beach area at Boca Raton. The beach, particularly that of Spanish River Park, is one of the nicest, if not the nicest, in South Florida. Over the years, this judge has gone there on various occasions to enjoy the beach, but had not done so for about three years. My reaction was one of pure dismay. North of the tunnel entrance to the parking lot of Spanish River Park the root structure of the trees has plainly been eroded with possibly a fourth to a third exposed.

In short, the judge's view of the beach was such that the erosion problem claimed by the City of Boca Raton to exist is real. It certainly is not illusory.

figures appear for the period prior to 1985. The data indicates the number of annual emergences of sea turtles onto the south restored beach area have remained roughly the same for 1985 and 1987 (between 273 and 276), but the successful nests increased from 102 in 1985 to 149 in 1987. The overall nesting success rate at the south Boca beach has increased from 37% in 1985 to 54.2% in 1987. In 1985 all of the successful nests were for loggerhead turtles, a threatened species, while in 1986 and 1987, a small number of green and leatherback turtle nests are included.

There is an estimate that prior to 1985 there were fewer than 50 successful turtle nests occurring annually on the one mile stretch of Boca Raton's south beach while the 1987 data shows a nesting density of 149 nests on the same one mile stretch of beach.

With Boca's background, experience and data regarding sea turtle hatching and survival on its beach, let us turn to the reasonable and prudent measures imposed by FWS on the City as to the instant permit. The FWS has been delegated the responsibility of monitoring compliance with the Endangered Species Act. Section 7(a)(2) of E.S.A. (16 U.S.C. §§ 1536(a)(2)).

### PROJECT'S COMPLIANCE WITH FISH AND WILDLIFE'S BIOLOGICAL OPINION

The City contends that the biological opinion of FWS is not mandatory under current federal regulations for FWS. Although there is reason to find support for the City's position on this question, the court will address this matter, for purposes of expediency, as if reasonable and prudent measures had to be followed as outlined, subject to any modification subsequently of them by FWS. The first reasonable and prudent measure set forth by the FWS in its biological opinion, with FWS stating previously that "incidental take is not authorized if the following reasonable and prudent measures are not implemented"—is as follows:

"Reasonable and prudent measures to minimize these impacts are as follows:

1. To minimize the need for nest relocation and therefore reduce the possibility of nest burial or crushing of missed nests, beach nourishment should be conducted before May 30 or after October 5 (*preferably before May 1 or after October 31*)" (Defendant City's Exhibit 34)

On April 1, 1988, the City wrote a detailed letter of compliance with all the requirements set forth in the October 9, 1987 biological opinion of FWS and indicated to FWS its item by item analysis of the actions already taken by the City and the operations plan to comply with FWS's requirements.

FWS responded to the City on April 20, 1988 by letter and stated that:

"Although a lawsuit has been filed, I am still hopeful any litigation can be resolved quickly and the project completed before June 1. However, in the event litigation, weather, or equipment breakdowns require activity to continue into June, it will be necessary to implement an alternative procedure to minimize the impact on nesting turtles. The Service recommends that, if it becomes necessary to conduct nourishment activities after June 1, 1988, hourly nighttime beach patrols during the entire nesting season be implemented. Hourly nighttime surveys and nest relocation to the secure hatchery will virtually ensure no nests are missed and therefore avoid any incidental take due to nest burial from nourishment material or crushing by heavy equipment. This will also enhance hatching success.

If nourishment activities are necessary beyond June 1, 1988, and the City implements the above stated alternative, you will be in compliance with the Endangered Species Act. We believe the City has acted in good faith to address all sea turtle conservation measures and this recommendation is consistent with a Service–Corps of Engineers agreement which attempts to minimize adverse impacts and maximize the benefits of beach nourishment for sea turtles." [Defendant City's Exhibit at Tab 35]

On April 25, 1988, the City responded to FWS's letter of April 20, 1988 agreeing to provide the hourly nighttime beach patrols and nest relocation throughout the construction phase of the project if nourishment activities extend or begin after June 1, 1988. (Defendant City's Exhibit Tab 36).

Plaintiffs contend that the biological opinion of October 9, 1987 cannot be altered by these subsequent letters, as if immutable, like the law of Medes and Persians. Such is not the case and the modification by FWS in this fashion is authorized and consistent with federal regulations.[2]

Consequently, the court finds that compliance by the City, whether already completed or as promised, will satisfy the requirements and limitations set forth by the U.S. Fish and Wildlife Service. With the City's track record, statistically supported, of relocation of sea turtle nests in the past and with the addition of the FWS requirement of hourly nighttime beach patrols agreed to by the City, the court finds that the limitations imposed by FWS will have been met.

## CONSIDERATION OF RECREATION

█ Plaintiffs contend that the Corps violated EPA guidelines and the Corps' own regulations by failing to adequately consider the effect of the renourishment project on recreation and specifically on opportunities for recreational viewing of marine life in and around the project area. In issuing the subject permit to the City of Boca Raton for the beach renourishment project, the Corps was required to comply with two separate sets of regulations. Both the EPA guidelines and the Corps regulations "must be observed." *Hough v. Marsh*, 557 F.Supp. 74, 81k (*D.Mass.1982).

First, § 404 of the Clean Water Act requires that Corps' permits conform to "guidelines developed by the EPA administrator." 33 U.S.C. § 1344(b)(1). These guidelines provide that "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the water of the United States." § 230.10(c). "Significant degradation" is defined to include "[s]ignificantly adverse effects of discharge of pollutants on recreational, esthetic, and economic values." § 230.10(c)(4).

Second, the permit issued by the Corps must comply with the Corps' own regulations, which mandate a public interest review in which the "benefits which reason-

2. Part 402 of 50 Code of Federal Regulations deals with inter-agency cooperation—Endangered Species Act of 1973, as amended. Within the scope of the spirit and rules of the Regulations, FWS and the Corps had been cooperating. This inter-agency cooperation is reflected clearly in FWS's letter of December 22, 1987 to the District Engineer of the Corps of Engineers in which FWS states that "if possible, every effort would be made to plan beach nourishment projects requiring offshore or other sources of fill for early May, or sooner, in an attempt to avoid intrusion into the peak of the nesting season on high density nesting beaches [includes Palm Beach County]. Where these projects, in spite of the aforementioned precautions, extend unavoidably into the nesting season, nest protection efforts will be expanded to insure that the maximum number of nests are found and relocated as early after deposition as possible to maximize hatching success."

Under 50 C.F.R. § 402.14(i) describing incidental take, it is clearly set forth in §§ (2) "reasonable and prudent measures, along with the terms and conditions that implement them cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes." FWS's letter of April 20th

is consistent, not only with federal regulations, but with the inter-agency cooperation reflected in the letter of December 22, 1987. The Corps, in fact, set out in its Statement of Findings that:

"It is recognized that the time frames proposed by the DER is not compatible to those suggested by the FWS. This problem should be resolved by the applicant, the DER, and the FWS in the same manner the Corps would resolve it if the Corps were doing the work."

A preamble to the regulations implementing ESA sets forth that the permit applicant plays an active role in the consultation process and that FWS remains available to discuss a biological opinion with the permittee on an informal basis. 51 Fed.Reg. 19,927 and 19,935.

Further, in FWS's own language in its promulgation of its regulations in 1986, it is stated:

"Reasonable and prudent measures were intended to minimize the level of incidental taking, but Congress also intended that the action go forward essentially as planned. Therefore, the Service believes that they should be minor changes that do not alter the basic design, location, duration, or timing of the action."

51 Fed.Reg. 19,937.

ably may be expected to accrue from the proposal must be balanced" with "its reasonable foreseeable detriments." 33 C.F.R. § 320.4(a)(1). In determining whether to issue a permit, "all factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are ... recreation...." 33 C.F.R. § 320.4(a)(1).

The Corps' issuance of a § 404 permit is subject to judicial review to ensure that the Corps has complied with its own regulations. The standard of review in cases such as that before this court is established in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). This section provides that the reviewing court "shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Hough,* 557 F.Supp. at 79.

As was recognized by the Supreme Court in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), "the court must consider whether the decision [to issue the permit] was based upon a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. at 823. The standard of review to be applied by this court in reviewing the agency action is "highly deferential." *Environmental Coalition of Broward County, Inc. v. Myers,* 831 F.2d 984, 986 (11th Cir.1987). In addition, the final agency action is "entitled to a presumption of regularity," and is to be upheld so long as "the path [the agency] followed can be discerned." *See, Sierra Club v. Corps of Engineers,* 772 F.2d 1043, 1051 (2d Cir. 1985); *Avoyelles Sportsmen's League, Inc. v. Marsh,* 511 F.Supp. 278 (W.D.La.1981), *aff'd,* 715 F.2d 897, 904 (5th Cir.1983).

In the instant case, Plaintiffs argue that the Corps utterly failed to consider the project's adverse impacts on opportunities for recreational viewing of marine life in and around the project area. Plaintiffs contend that such omission is particularly egregious due to the fact that EPA's guidelines require the Corps to place "special emphasis on the persistence and permanence" of any adverse impacts in gauging whether adverse impacts are significant. § 230.10(c). Plaintiffs assert that the Corps' failure to consider the project's adverse impact on underwater recreation is arbitrary and capricious and not in accordance with law.

A review of the Corps' findings, however, clearly indicates that the Corps gave significant consideration to the effect that the project would have on recreation as a whole. Indeed, the entire purpose of the project is to enhance opportunities for recreation in the project area. The Corps' consideration of recreational factors, including those associated with the nearshore rocks, is reflected at several different points in the Corps' November 12, 1987 Statement of Findings regarding the Boca Raton permit application. *See,* exhibit 4 to the Federal Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, pages 1–5; Memorandum in Support of Federal Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, pages 21–22. Recreation also played a significant role in the Corps' analysis of practicable alternatives and their respective impacts. *Id.* at 5–6; Memorandum at 22.

Plaintiffs contend, however, that it was incumbent on the Corps to give more detailed consideration of the effect of the project on underwater recreation and snorkeling in particular. Plaintiffs assert that underwater recreation is among the two or three most critical environmental issues surrounding the Boca Raton nourishment project.

This court concludes that under EPA guidelines and Corps regulations, the Corps was not required to consider snorkeling as a totally separate factor. Even assuming, arguendo, however, that such consideration is mandated, the Corps did in the case at bar, give adequate consideration to the effect that the proposed project would have on snorkeling and underwater recreation.

For example, in describing the proposed project in the November 12, 1987 Statement of Findings the Corps explained:

This project was reduced from the original 1.9–mile proposal in order to preserve exposed nearshore rock formations (limerock areas) in an exposed (unburied) state. Rock outcrops at Japrock, in South Beach Park, at Palmetto Park Pavilion, and at South Inlet Park south of the proposed area, would also be preserved.... The DER permit also requires the placement of a rubble mound groin north of Red Reef Rock and six artificial reef modules just offshore from Red Reef Rock. The groin is designed to protect the rock outcroppings from littoral drift and the six reef modules are required by DER as mitigation for near shore rock outcroppings which will be covered by beach fill.

Exhibit 4 to the Federal Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction at 1.

In addition, in discussing recreation in the context of its public interest review, the Corps stated:

As mitigation, the applicant has offered to construct six 14–foot by 14–foot artificial reefs which will be placed in approximately 8 feet of water immediately south of Red Reef Rock.

*Id.* at 9.

The Corps also focused specifically on the impact of the proposed project on underwater recreation in the Statement of Facts on the City's separate application for construction of the modules. In the Corps' Statement regarding that application, the Corps explicitly stated:

The artificial reef modules were located in this particular area to mitigate for possible burial of rock outcrops, which provides a recreational amenity to snorklers.

Exhibit 15 to the Federal Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction at 3.[3]

The Corps specifically notes in said Statement that "the artificial reef modules will provide recreational [opportunity] for snorklers in that area." *Id.* at 8.

The Corps concluded that the artificial reef modules required by the State permit sufficiently mitigated any adverse impact on snorkeling. Although Plaintiffs complain that the artificial reefs are insufficient mitigation for the loss of snorkeling at the nearshore rock outcroppings, the record amply supports the conclusion of the Corps. This court cannot say that the Corps acted unreasonably in accepting the State's determination that the artificial reefs are adequate. It should be kept in mind the City has already constructed the artificial reef modules.

This court finds, therefore, that the Corps met all of its procedural obligations by carefully considering and balancing recreational factors. There is credible evidence in the record to support the decision of the Corps and the findings of the Corps satisfy the requirements set forth in 40 C.F.R. § 230.10(c) and 33 C.F.R. § 320.4(a)(1). This court is unable to conclude that the agency action in the case before the court is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Accordingly, this court declines to reverse the decision of the Corps to issue the subject permit.

Plaintiffs further contend that the Corps failed to comply with the National Environmental Policy Act. Plaintiffs argue that the Corps failed to comply with NEPA in that the Environmental Impact Statement prepared in connection with the project at issue fails to analyze what impact burial of the nearshore reefs will have on recreational viewing of marine life.

The standard of review that this court must apply when reviewing an agency decision under NEPA is as follows. When reviewing an agency decision under NEPA,

---

**3.** The City complained at argument that there were two projects being considered at the same time (considered as one by DER): one for the beach nourishment, attacked in the instant suit, and the other dealing with mitigation of or compensation for any environmental or recreational loss with respect to the near shore rock by constructing artificial modules, one near the north end's Jap Rock and the other near the south end of Boca's five mile beach near Red Reef Rock Park. The artificial modules permit was not challenged by Plaintiffs and the modules and groin have, in fact, been constructed at a cost to the City of $400,000.00.

"the [Court's] purpose is to ensure that the agency has considered the environmental consequences of its proposed actions." *Sierra Club v. United States Army Corps of Engineers*, 772 F.2d 1043, 1050 (2d Cir. 1985), *citing Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980). "The judicial role is relegated to affirming the agency's decision so long as a rational basis is presented for the decision reached." *Id., citing Bowman Transportation, Inc. v. Arkansas–Best Freight Systems*, 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974). In addition, Plaintiffs have "the burden of showing by a preponderance of the evidence that the Defendants failed to adhere to the requirements of NEPA." *Druid Hills Civic Ass'n v. FHA*, 772 F.2d 700, 709 n. 9 (11th Cir.1985).

The Environmental Impact Statement concerned in the case at bar describes the nearshore rock outcroppings in detail and gives extended consideration to their ecological significance. *See*, Exhibit 1 to Federal Defendants Opposition to Plaintiffs' preliminary Injunction. On the record presented to this court, it is impossible to conclude that the Environmental Impact Statement was not compiled in objective good faith or was inadequate to permit a decision-maker to fully consider and balance the environmental factors involved in the proposed project. Plaintiffs have utterly failed to demonstrate that Defendants failed to adhere to the requirements of NEPA in the instant case.

In addition, this court notes that none of the Plaintiffs commented on the draft EIS for the proposed project when it was available for public comment in spite of the fact that copies were sent to two of the Plaintiff organizations. As was recognized by the Supreme Court in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), private parties have an obligation to raise issues in a timely manner in the NEPA process. Plaintiffs in the case before the court failed to do so and are, therefore, foreclosed from claiming that the EIS is inadequate in failing to give more extended treatment to snorkeling.

In accordance with the foregoing, this court concludes that the Corps complied with EPA guidelines and the Corps' regulations in issuing the subject permit to the City of Boca Raton for the beach renourishment project. Although Plaintiffs disagree with the substantive findings of the Corps, such disagreement is insufficient for a reversal of the agency decision by this court.

## WIDTH OF THE BEACH

Plaintiffs contend that the Corps acted arbitrarily in issuing a permit for an additional beach width of 100 to 120 feet, rather than the 25 to 50 foot additional width set forth in the General Design Memorandum for the Palm Beach County federal nourishment project. Plaintiffs argue that the Corps' decision to allow the 100 to 120 foot beach width violates EPA Guidelines and improperly deviates from the conclusions of the General Design Memorandum.

The pertinent EPA Guidelines state that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative ... which would have less adverse impact on the aquatic significant adverse environmental consequences." 40 C.F.R. § 230.10(a). The Guidelines define an alternative as practicable "if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of oversall project." *Id.* § 230.10(a)(2); *see also* 45 Fed.Reg. 85339 (1980). Section 230.10(a)(4) of the EPA Guidelines also specifically indicate that the range of alternatives considered in NEPA documents will, in most cases, be sufficient for Section 404 purposes.

Plaintiffs argue that the 25 to 50 foot beach width is a separate practicable alternative from beach renourishment in general and that the Corps had an obligation to consider the lesser width as a practicable alternative to the proposed beach nourishment project. Plaintiffs contend that the narrower width is a scaled-down version of the proposed agency action which provides a valid alternative with less adverse impact

on the aquatic ecosystem and that, therefore, the narrower width must be discussed in the Environmental Impact Statement for the project.

The Corps considered a total of twenty-one alternatives to the proposed beach nourishment project in the Environmental Impact Statement at issue, including taking no action. Three alternatives were discussed at length. *See,* Exhibit 1 to Federal Defendant's Opposition at EIS–7. The Statement of Findings also discussed six practicable alternatives and their impacts and indicated why these alternatives were either rejected or accepted in part. *See,* Exhibit 4 to Federal Defendant's Opposition at 5–7.

Plaintiffs contend, however, that in spite of the detailed analysis of various practicable alternatives conducted in the case at bar, the Corps acted arbitrarily and capriciously by failing to consider the additional alternative of a narrower beach.

Initially, this court notes that the Corps did, in fact, consider beach nourishment projects of varying widths in the context of the General Design Memorandum and the Environmental Impact Statement. *See,* Exhibit 1 to Federal Defendant's Opposition at 37; at EIS–9 (showing that average annual monetary benefits of 120 foot wide beach at Boca Raton exceeded benefits of 25 foot wide beach); at D–11 (comparing beach widths of 25, 50, 100, and 120 feet for Boca Raton project); at D–18 and E–59–61.

Additionally, this court notes that following the analysis of various practicable alternatives, the Corps concluded that the most practicable alternative for Boca Raton was beach fill with nourishment. As is explained by Defendant City of Boca Raton, specific beach widths do not constitute separate action alternatives within the meaning of the EPA Guidelines. Rather, the specific beach widths are merely different design specifications for implementing the Corps' preferred alternative of beach restoration with nourishment.

This Court concludes that although the Corps voluntarily did so, the Corps was not required to consider a variety of different beach widths within the alternative of beach fill with nourishment. As was explained by the Fifth Circuit Court of Appeals in *Sierra Club v. Morton,* 510 F.2d 813 (5th Cir.1975), varying widths are "not an alternative *to* the project, but merely another means of proceeding *with* the project so that the environmental consequences should be substantially the same in either case." *Id.* at 825 (emphasis in original).

Plaintiffs argue, however, that the 25 to 50 foot beach width would have "less adverse impact on the aquatic ecosystem" within the meaning of § 230.10(a). As is recognized by Defendants, the only possible practical environmental difference between a 25–foot wide beach and a 100–foot wide beach is the possible impact on the nearshore rocks. However, the coverage of the rocks in the case at bar would be identical whether the project entails a 25–foot wide beach or a 100–foot wide beach. *See,* Exhibit 11 to City's Opposition. The impact of the proposed project on the nearshore rocks would, therefore, not differ if a narrower beach width were adopted. This court notes that "where there is no significant or easily identifiable difference in impact, the alternative need not be considered to have 'less adverse' impact." 45 *Fed. Reg.* 85339 (1980).

Indeed, the City of Boca Raton identifies two ways in which a 25–foot or 50–foot width would arguably have significant *adverse* environmental consequences compared to a 100–120 foot width. First, the narrower beach does not provide the same amount of nesting sites for the endangered species of turtles that lay their eggs on the beach as would a 100–125 foot beach. *See,* Exhibit 10 to City's Opposition. Second, the lesser beach width would require more frequent renourishment than the 100–120 foot width project. *See,* Exhibit 11 to City's Opposition. Accordingly, the lesser width alternative does have "other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). The lesser width is not, therefore, a viable alternative within the meaning of the standards in the Guidelines. *See,* 45 *Fed.Reg.* 85340 (1980). Fur-

ther, "[a]n alternative which would result in similar harm ... need not be discussed.," *Sierra Club v. Morton,* 510 F.2d 813, 825 (5th Cir.1975).

Finally, this court notes that Plaintiffs failed to assert that a 25–foot beach might be a practicable alternative until the commencement of the instant case, although the permit application of the City sought leave for an additional beach width of 120 feet from inception. When alternatives were being considered during the Environmental Impact Statement process, these Plaintiffs submitted no comments whatsoever. Nor did they, or anyone else, ever suggest to the Corps during the permit proceeding that a narrower beach might be acceptable. Rather, the Plaintiffs that did participate in the EIS process and the permit proceeding opposed all beach nourishment activity. As in *Sierra Club v. Morton,* while this court "would not be understood as holding that every alternative which an opponent fails to mention before an EIS is finalized is waived, Plaintiffs' actions here are worthy of note in adjudging the statement's adequacy as against the contention that [narrower width] was of such significance that the statement is faulty because it was not considered." *Id.* at 826.

Plaintiffs also contend that the Corps' decision to issue a permit for a beach width of 100 to 120 feet rather than the 25 to 50 foot width contemplated by the General Design Memorandum was arbitrary and capricious. Initially this court notes that the conclusions of the General Design Memorandum regarding practicability and desirability applied to the plan for beach nourishment generally, rather than to any specific beach width. It was clearly the beach nourishment alternative generally rather than any specific beach width that was designated in the General Design Memorandum as "the environmentally preferred plan." GDM at 41. ¶ 116.

Additionally, the court notes that the 25 to 50 foot width that was selected in the General Design Memorandum was based entirely upon monetizable costs and did not consider environmental factors that were not monetizable. The General Design Memorandum was intended to serve the limited purpose of determining the extent of the federal government's role in cost-sharing; it did not involve the same factors as consideration of practicable alternatives under the EPA Guidelines. Accordingly, the width selected for purposes of the National Economic Development was economically, but not necessarily environmentally, preferable to other widths.

Plaintiffs also complain that the Corps' decision to diverge from the 25 to 50 foot width set forth in the General Design Memorandum for the Palm Beach federal nourishment project is inconsistent with the Corps' rationale for rejecting the proposal of the Environmental Protection Agency that the length of the nourished beach be shortened from 1.45 miles to 1.05 miles. As was previously noted, however, the National Economic Development factors aim to identify the project which is the most economical according to the federal government's cost-benefit calculations. Neither the EPA's proposal nor the City's plan meet the National Economic Development cost criteria. As the City explains, the difference between the two is that the City, pursuant to 33 C.F.R., has agreed to pay for the difference between the cost of the National Economic Development plan and the permitted plan. No such offer was made in connection with the proposal of the Environmental Protection Agency. Accordingly, the Corps has, in the case before the court, remained faithful to the calculation of how much federal funds may be expended for the project.

This court concludes, following a complete review of the record in this action, that Plaintiffs have failed to demonstrate that the Corps' issuance of the permit for the renourishment project was arbitrary or capricious. Rather, this court finds that the Corps acted reasonably in granting the City of Boca Raton a permit for a 100 to 120 foot wide beach as opposed to a 25 to 50 foot wide beach.

## SUMMARY

Boca Raton's north beach nourishment restoration project has been reviewed thor-

oughly—not just by federal agencies, but by state agencies as well. Each of them has approved the project, there were some relatively few concerns of some of the agencies at some point in time, but those have been fully addressed and dispelled.

At the time of the hearing in the instant case the City had received permits for this project from the Florida Department of Environmental Regulations (DER), the Florida Department of Natural Resources (DNR), the United States Army Corps of Engineers (Corps); additionally, it had received funding from the Florida legislature and the Governor. The project has been the subject of two administrative proceedings at the state level, two full rounds of notice comment proceedings, which included public hearings, at the federal level. The Environmental Impact Statement of the Corps has been detailed and well documented and it has been reviewed, pursuant to various regulatory procedures, by several other federal agencies, including the United States Fish & Wildlife Service (FWS) and the United States Environmental Protection Agency (EPA).

Without counting the pages, but only estimating, the record in this case is extensive and must number in the thousands of pages at this point in time. The matter has not come to this court with an absence of tracks on the trail. Instead, they are many. Plaintiffs in this case bear the strong burden of showing before a preliminary injunction would lie in their favor that "(1) a substantial likelihood that Plaintiff would prevail on the merits, (2) a substantial threat that Plaintiffs will suffer irreparable injury if the injunction is not granted (3) that the threatened injury to Plaintiffs outweighs the threatened harm the injunction may do to Defendant and (4) that granting the preliminary injunction would not disserve the public interest." *U.S. v. Lambert,* 695 F.2d 536, 539 (11th Cir.1983); *Canal Authority v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974). In fact, the pattern of beach erosion as well as the resulting higher percentage of relocated turtle nests annually indicates any delay would disserve the public interest.

The preliminary injunction is an extraordinary and drastic remedy and granting it is the exception rather than the rule. Plaintiffs must clearly carry the burden of persuasion.

Alas for Plaintiffs. Not only have they failed to carry all four prerequisites in order for preliminary injunction to issue, but this court finds that they have failed to carry any of them. Therefore, Plaintiffs' motion for preliminary injunction must be denied.

As much as the parties consented to a consolidation of the preliminary injunction and permanent injunction on the issues presented in this case, *viz.,* violation of the Endangered Species Act, consideration of recreational alternatives, and width of the beach, the prayer for permanent injunction must also be denied.

Plaintiffs reserved certain matters for consideration by the court in the stipulation and the parties are to prepare those issues for the court expeditiously.

DONE AND ORDERED.