**CITY OF ALBUQUERQUE, Plaintiff,**

v.

**Carol M. BROWNER, Administrator, United States Environmental Protection Agency, Defendant.**

**Civ. No. 93–82–M.**

United States District Court,
D. New Mexico.

Oct. 21, 1993.

Gregory P. Smith, Albuquerque City Attys. Office, Albuquerque, NM, Bruce S. Gar-

ber, Garber & Hallmark, Santa Fe, NM, for plaintiff.

John W. Zavitz, U.S. Attys. Office, Dist. N.M., Albuquerque, NM, Myles E. Flint, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, Pat Rankin, U.S. Environmental Protection Agency, Asst. Regional Counsel, Dallas, TX, Randolph L. Hill, U.S. Environmental Protection Agency, Washington, DC, Elizabeth M. Ahern, U.S. Attys. Office, N.D. Ga., Atlanta, GA, for defendant.

L. Lamar Parrish, Ussery & Parrish, Albuquerque, NM, for amicus curiae, Isleta of Pueblo.

## MEMORANDUM OPINION AND ORDER

MECHEM, Senior District Judge.

This matter comes on for consideration on cross motions for summary judgment filed June 11, 1993. Having reviewed the motions, responses and replies, and being otherwise fully apprised in the premises, I find that defendants' motion is well taken and will be granted and that plaintiff's motion is not well taken and will be denied.

The City filed suit under the Administrative Procedure Act, 5 U.S.C. § 551 et seq. and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. This Court is authorized to review the actions of federal agencies under the Administrative Procedure Act, 5 U.S.C. § 551 et seq.

### BACKGROUND

This case concerns the quality of Rio Grande water south of Albuquerque where the river flows through Isleta Pueblo. The river runs north to south through New Mexico before turning east and south to form the border between Texas and Mexico. Albuquerque's waste treatment facility outfall is approximately five miles north of the Isleta Pueblo boundary.

The waste treatment facility discharges to the Rio Grande under a National Pollution Discharge Elimination System (hereinafter "NPDES") permit issued by the U.S. Environmental Protection Agency (hereinafter "EPA"). EPA sets permit discharge limits for the facility to meet New Mexico's water quality standards. EPA revised the City's NPDES permit a year ago to reflect the State's new, more stringent standards. On October 12, 1992, while that revision was in progress, EPA recognized Isleta Pueblo as a state for purposes of the Clean Water Act, § 518(e), 33 U.S.C. § 1377(e). EPA delayed issuing the City's revised permit until the Pueblo's proposed water quality standards were approved. EPA approved the Pueblo's standards on December 24, 1992, and is preparing a NPDES permit for the City wastewater treatment facility that will meet the Pueblo's standards as well as the State's. The Pueblo's standards are more stringent than the State's. The City of Albuquerque challenges the agency's approval of Isleta Pueblo's water quality standards.

The City filed a complaint on January 25, 1993, and on February 2, 1993, moved this court for a temporary restraining order and then for a preliminary injunction. After a hearing on February 17, 1993, I denied both requests. The City amended its complaint on March 16, 1993, and renewed its motion for a preliminary injunction on July 23, 1993, after receiving EPA's Draft NPDES permit. The parties filed cross motions for summary judgment on June 11, 1993, and submitted responses and replies to one another's motions.

The City challenges the agency's approval of the Pueblo's water quality standards on several grounds. Specifically, the City alleges that EPA failed to follow the required procedures in approving the standards, misinterpreted two provisions of the Act in approving the standards, and approved standards that are unconstitutional. Further, the City asserts that EPA violated the Act by failing to provide a mechanism to resolve unreasonable consequences which arise when a State and a Tribe impose different standards on a common body of water, and by failing to ensure that the Pueblo standards are stringent enough to protect the designated uses. Finally the City asserts that the Pueblo's water criteria are without any rational scientific basis and should not have been approved.

## DISCUSSION

The parties dispute the appropriate scope of the court's review and the materials which properly form the record for review.

### A. Scope of Review

■■■ The City asks this court to review the agency's decision under the Administrative Procedure Act, 5 U.S.C. § 551 (hereinafter "APA"). The City also asserts jurisdiction under the Declaratory Judgment Act 28 U.S.C. §§ 2201, 2202, and argues that the court's authority under the Declaratory Judgment Act expands the record available for judicial review beyond the administrative record compiled by the agency. The City cites no authority for this argument. EPA's position is that the court may properly review only the administrative record the agency reviewed in making the challenged decision. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985). The reviewing court does not review the facts *de novo* or reach an independent conclusion. *Id.* at 744, 105 S.Ct. at 1607. The Declaratory Judgment Act is not an independent grant of jurisdiction and does not enlarge the parties' substantive rights. Action brought under the Declaratory Judgment Act does not alter the scope of review. *Davis v. United States Dept. of Housing*, 627 F.2d 942 (9th Cir.1980).

The agency is correct but the argument is of no matter in this case. The information relied on by the City is incorporated into the administrative record in the form of comments to the Pueblo or to EPA, or was presented at the February 17 hearing. I consider the administrative record in reviewing the agency's decision to approve Isleta's standards, but I cannot fail to take notice of the information presented in the hearing, much of which the agency did not dispute.

■■■ I review the EPA's decision to approve Isleta's water quality standards to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... without observance of procedure required by law; ... [or] unsupported by substantial evidence...." Administrative Procedure Act, 5 U.S.C. § 706(2). The arbitrary and capricious standard demands considerable deference to agency decisions and presumes the validity of the agency's action. *Colorado Health Care Ass'n v. Colorado Dept. of Social Services*, 842 F.2d 1158, 1164 (10th Cir.1988). The substantial evidence inquiry is whether the agency based its decision on relevant evidence a reasonable mind might accept as appropriate to support such a decision. *Foust v. Lujan*, 942 F.2d 712, 714 (10th Cir.1991).

■■■ The standard of review is very narrow. The reviewing court must affirm a reasoned decision which is supported by substantial evidence in the record. *Shell Oil v. Costle*, 595 F.2d 224 (5th Cir.1979). Judicial review is especially deferential where the agency interprets its own regulations. *Robertson v. Methow Valley Citizen's Council*, 490 U.S. 332, 358–59, 109 S.Ct. 1835, 1850–51, 104 L.Ed.2d 351 (1989). The agency has broad discretion when faced with conflicting technical opinions. *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1524 (10th Cir.1992). The reviewing court must affirm a reasoned decision which rests on a review of all relevant information, even if the reviewing court would not have reached the same conclusion. *Citizens to Preserve Overton Park Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). The City here misconstrues the endpoint of judicial review. Were I to find the agency acted arbitrarily or outside the scope of its authority, I may order it to reconsider its decision in light of additional relevant information, but I may not impose a new decision on the agency. *Florida Power & Light Co.*, 470 U.S. at 744, 105 S.Ct. at 1607.

### B. Statutory Requirements

■■■ The Clean Water Act (hereinafter "Act") is a comprehensive statute designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through the reduction and eventual elimination of pollutant discharge into those waters. Clean Water Act § 101(a), 33 U.S.C. 1251(a). The Act anticipates a partnership between the federal government and the States in cleaning up the nation's waterways.

Clean Water Act § 101(b), 33 U.S.C. § 1251(b). States are free to set water quality standards so as to force the development of technology. *United States Steel Corp. v. Train*, 556 F.2d 822, 838 (7th Cir.1977).

In 1987, Congress revised the Act, authorizing the EPA Administrator to treat Indian Tribes as States for the purposes of the Clean Water Act so long as the Tribes meet certain enumerated criteria. Clean Water Act § 518, 33 U.S.C. § 1377. A Tribe which meets the criteria listed in § 518(e), 33 U.S.C. § 1377(e) and 40 C.F.R. § 131.8(a), may submit an application to the EPA that includes: a statement that the Secretary of the Interior recognizes the Tribe; a statement documenting that the current Tribal governing body carries out substantial government functions; a description of the Tribe's authority to regulate water quality; a description of the Tribe's ability to administer a water quality standards program; and any additional information the Administrator may require. 40 C.F.R. § 131.8 (1992).

Upon receipt of the application, the Regional Administrator will notify appropriate government entities of the Tribe's application and the basis of the Tribe's authority to regulate water quality. The Administrator provides a thirty-day period to receive comments on the Tribe's assertion of authority. If comments challenge the Tribe's authority, the Regional Administrator, after consulting with the Secretary of the Interior, shall determine whether the Tribe meets the requirements of 40 C.F.R. § 131.8(a)(3) (1992).

Once recognized as a State for purposes of the Act, a Tribe may submit proposed water quality standards to EPA. The Act provides for two measures of water quality. One measure is an "effluent limitations guideline." Effluent limitation guidelines are uniform, technology-based standards, promulgated by EPA, which restrict the quantities, rates and concentrations of specified substances discharged from point sources. *See* Clean Water Act §§ 301 and 304, 33 U.S.C. §§ 1311, 1314. The other measure of water quality is a "water quality standard." Unlike the technology-based effluent limitations guidelines, water quality standards are not based on pollution control technologies, but express the desired condition or use of a particular waterway. Water quality standards supplement technology-based effluent limitations guidelines "so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels." *Environmental Protection Agency v. California ex. rel. State Water Resources Control Bd.*, 426 U.S. 200, 205 n. 12, 96 S.Ct. 2022, 2025 n. 12, 48 L.Ed.2d 578 (1976).

Water quality standards consist of three elements: (1) one or more designated "uses" of each waterway (*e.g.*, public water supply, recreation, or agriculture) consistent with the goals of the Act as articulated in § 101; (2) "criteria" expressed in numerical concentration levels or narrative statements specifying the amount of various pollutants that may be present in the water and still protect the designate uses; and (3) an anti-degradation provision. Clean Water Act § 303(c)(2)(A), 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. Part 131 (1992).

EPA provides States with substantial guidance in drafting water quality standards. Section 304(a) of the Act requires EPA to develop criteria for water quality that reflect the latest scientific knowledge, and to provide those criteria to the States as guidance. Clean Water Act § 304(a), 33 U.S.C. § 1314(a). The States are free to draw upon EPA's recommended water quality criteria, but are equally free to use other criteria for which they have sound scientific support. *See* 48 Fed.Reg. 51,400, 51,411 (1983).

Prior to adopting or revising any water quality standard, the state must provide notice and an opportunity for a public hearing. 40 C.F.R. § 131.10 (1992). States must adopt criteria that protect the designated uses. 40 C.F.R. § 131.11 (1992). The criteria may be based on EPA guidance, EPA guidance modified to reflect conditions at the site, or on other scientifically defensible methods. *Id.*

After adoption, the States must submit the water quality standards to EPA for review and approval. Clean Water Act § 303(c)(2),

33 U.S.C. § 1313(c)(2); 40 C.F.R. § 131.20(c) (1992). EPA reviews the State's water quality standards to ensure they are consistent with the Act's requirements. Clean Water Act § 303(c)(3), 33 U.S.C. § 1313(c)(3). If EPA concludes that the standards are inconsistent with the Act, the agency must notify the State of that fact within ninety days and specify the changes necessary to bring the proposed standards into compliance. Clean Water Act § 303(c)(3), 33 U.S.C. § 1313(c)(3). If the State fails to adopt the specified changes within ninety days, the agency will promptly propose a federal water quality standard, and will issue a final federal standard within 90 days of proposal. Clean Water Act § 303(c)(4)(A), 33 U.S.C. § 1313(c)(4)(A).

### C. Procedural Challenges

■ The City asserts that the agency failed to meet procedural requirements imposed on all agency rulemaking by the Administrative Procedure Act, 5 U.S.C. § 553. Specifically, the City argues that approval of Isleta's standards was rulemaking, and the agency had to give the public notice and provide for a comment period prior to approving the standards. *Buckeye Power, Inc. v. EPA*, 481 F.2d 162, 170 (6th Cir.1973) (approval of state standards under the Clean Air Act is rulemaking subject to procedural requirements of the Administrative Procedure Act, 5 U.S.C. § 553).

States must hold public hearings when reviewing or revising water quality standards. Clean Water Act § 303(c); 33 U.S.C. § 1313(c). On June 8–11, 1991, the Pueblo published notice of a public hearing on its proposed standards in the Albuquerque Journal, as required by § 303(c)(1) of the Act, 33 U.S.C. § 1313(c)(1). The Pueblo also mailed notice of the hearing to potentially interested parties, including the City. The Pueblo held a public hearing on August 7, 1991. When the agency issues a federal water quality standard, it must provide public notice and comment. Clean Water Act § 303(b), 33 U.S.C. § 1313(b). However, EPA asserts that it need not provide notice and comment prior to approving state water quality standards for several reasons. First, the plain language of the Act requires the agency to provide notice when it promulgates a standard and requires states to provide notice when they promulgate or revise standards. If Congress wanted the agency to provide additional notice upon approving state standards, it could have included that language in § 303(c)(1). Second, all comments submitted to a State or Tribe during the comment period become part of the administrative record and are reviewed by the Administrator in deciding whether to accept or reject the State's proposed standards. *Id.* Therefore, the purpose of notice and comment is satisfied under the Act without an additional comment period. No purpose is served by requiring the Administrator to receive comments. Finally, the statute allows the Administrator sixty days to approve State standards, and the time frame precludes another notice and comment period. I am persuaded that the purposes of the APA are met under the Act's procedural scheme, that the agency has reasonably implemented the Act's procedural requirements and has committed no procedural error.

### D. Sections 510 and 518

■ The City next argues that EPA improperly implemented § 518, authorizing EPA to treat Tribes as States, when it incorrectly determined that § 510 of the Act applies to Tribes as well as to states. Section 510 forbids any state from imposing any "effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance" which is less stringent than federal standards. Clean Water Act § 510, 33 U.S.C. § 1370. The section preserves the state's right to impose standards or limits that are more stringent than those imposed by the federal government. *Id.* Section 518 does not reference § 510, but it does incorporate § 303, authorizing States to develop water quality standards. Under the City's reading of § 518, Tribes would be authorized to develop water quality standards neither more nor less stringent than federal standards. This construction makes § 518 meaningless and conflicts with EPA's stated policy with respect to Indian Tribes and with general principles of federal Indian law. *See State of*

*Washington Department of Ecology v. Environmental Protection Agency,* 752 F.2d 1465, 1471 (9th Cir.1985). EPA has consistently interpreted § 518 to include § 510, and has interpreted § 510 as a savings clause, recognizing an authority already held by the states rather than conferring some new authority. 56 Fed.Reg. 64,886 (1991).

EPA's position is further supported by the reference to § 1341 in § 518. Section 1341 appears to require EPA to issue permits that comply with a downstream state's water quality standards. Clean Water Act § 401, 33 U.S.C. § 1341; *Arkansas v. Oklahoma,* 503 U.S. 91, ——— n. 9, 112 S.Ct. 1046, 1055 n. 9, 117 L.Ed.2d 239 (1992). The Supreme Court found that, even if the Act does not require the upstream discharger to comply with downstream state standards, the statute does not limit EPA's authority to require such compliance. *Arkansas v. Oklahoma,* 503 U.S. at ———, 112 S.Ct. at 1056. I believe the same argument must apply to an upstream discharger and a downstream Tribe. I find no support for the City's position on this issue and hold that EPA properly recognized the Pueblo's authority to develop water quality standards more stringent than those of the federal government.

### E. Mechanism to Resolve Unreasonable Consequences

■ The Act directs the Administrator to establish a mechanism for resolving any unreasonable consequences arising when a State and a Tribe impose different water quality standards on a common body of water. Clean Water Act § 518(e), 33 U.S.C. § 1377(e). The City complains that EPA's regulations only allow a State or a Tribe to initiate the resolution process, and therefore the mechanism fails to meet statutory requirements. In developing the regulations the EPA considered whether, in addition to the State and the Tribe, affected parties should be involved in the resolution process and determined that such parties could be invited to participate. However, the EPA allows only States and Tribes to initiate the resolution process because they are the entities authorized to revise or modify the water quality standards in question. I find that

EPA's regulations meet the statutory mandate, were developed after careful consideration of relevant factors and are not arbitrary or capricious.

### F. Failure to Protect Designated Uses

■ The City next changes gears to argue that the EPA improperly accepted Pueblo standards that are not stringent enough to protect the designated uses, specifically primary contact ceremonial use and primary contact recreational use. Pueblo members are reluctant to describe what ceremonial use of the river entails, but the parties agree that this use includes some ingestion of water. The City assumes that this use therefore requires the river to meet Safe Drinking Water Act, 42 U.S.C. § 300f, standards. The proposed water quality standards do not ensure drinking water quality in the river and, therefore, the City argues that EPA improperly approved the standards.

This argument seems far-fetched. The primary contact ceremonial use appears to resemble a fishable/swimmable standard, which assumes the ingestion of some water, more than it resembles a safe drinking water standard, which assumes the ingestion of a volume of water daily. None of the comments recorded in the administrative record, including those made by the City, cautioned the Pueblo or the EPA that the standards are not stringent enough and I reject the argument.

### G. Standards are Unconstitutional

■ The City first suggests that the EPA, in recognizing a ceremonial use standard, has violated the Constitution's Establishment Clause by imposing a mandate which aids tribal religion at City expense. Both the City and EPA correctly cite *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) as the proper analytical framework for this question. EPA asserts that the primary purpose of the designated uses is to support the goals of the Clean Water Act. The Pueblo's designation of a ceremonial use does not invalidate the overall secular goal. The EPA here does not advance religion through its own actions, and is not promoting the Pueblo's religion. There

is certainly no excessive entanglement here between the government and religion and I reject the City's Establishment Clause argument.

■ The City also argues that the standards are unconstitutionally vague. The City's vagueness argument is insupportable. A regulation will not be deemed impermissibly vague as long as it puts the regulated party on notice as to what conduct is required. *Brock v. L.R. Willson & Sons, Inc.*, 773 F.2d 1377 (D.C.Cir.1985). Water quality standards, both desired uses and criteria, may be merely narrative descriptions. 40 C.F.R. §§ 131.1 and 131.2 (1992). The standards alone do not require any particular conduct by the City. Rather, the City will have notice of specific enforceable standards it must meet when EPA issues the City's revised NPDES permit.

## H. Rational Basis, Unattainable

■ The City cites technical information outside the administrative record to support its argument that the Pueblo standards are unattainable. Much of this information was presented in court. It is clear that the City raises realistic technical concerns. However, EPA reviews proposed water quality standards only to determine if they are stringent enough to protect the proposed water quality standards. 40 C.F.R. §§ 131.5; 131.11(a) (1992). The EPA does not believe it is authorized to reject proposed standards because they are more stringent than background levels. 56 Fed.Reg. 64,886 (1991). EPA lacks the authority to reject stringent standards on the grounds of harsh economic or social effects. *Homestake Mining Co. v. Environmental Protection Agency*, 477 F.Supp. 1279, 1283 (D.S.D.1979).

In reviewing the administrative record I find that the agency and the Pueblo conferred extensively about technical aspects of the proposed standards and the Pueblo was able to document, to the agency's satisfaction, the technical basis for the standards. For example, the City argues that the Pueblo should include provisions in the standards for low flow periods, during which standards should be less stringent. The City asserts that the lack of such provision makes the standards unattainable and too expensive, and that they are therefore arbitrary and capricious. When EPA suggested the Pueblo consider a relaxation of the standards during low flow periods, the Pueblo replied that members generally use the river more intensively for ceremonial purposes during low flows, and it would be particularly inappropriate to relax standards at those times. There are a number of examples in the administrative record where the Pueblo provides EPA with cogent reasons for retaining more stringent standards. The arbitrary and capricious review standard is very deferential so long as the reviewing court can discern the agency's journey from the factual record to the decision. *American Littoral Society v. Herndon*, 720 F.Supp. 942, 950 (S.D.Fla.1988). The agency has adequately supported its decision-making process and I must uphold EPA's action to approve the Pueblo's water quality standards.

Although under the standard of review imposed by the APA I must uphold the agency decision in this case, I note that the city raises some very troubling issues here. I also note EPA's apparently inconsistent position with respect to NPDES permits affecting water quality standards of downstream states. The EPA has argued that the proper criterion to measure the effectiveness of a discharge limit in meeting a downstream standard is whether the discharge will measurably affect the water quality in the downstream river. *Arkansas v. Oklahoma*, 503 U.S. at ——, 112 S.Ct. at 1052. The legal issues in that case are distinguished because the focus in *Arkansas* was on the downstream state's anti-degradation policy rather than the designated uses and criteria challenged here. Oklahoma challenged EPA's reluctance to impose stricter discharge limits in the NPDES discharge permit issued to an upstream facility. The Supreme Court recognized the agency's authority to require compliance with the downstream state standards, and affirmed EPA's determination that the proposed permit would not measurably affect Oklahoma's water quality. EPA's conclusion that downstream water quality would be unaffected by the discharge was based on evidence in the record. In this

case, EPA is prepared to include limits in the City's NPDES permit to ensure that discharged water at the facility outfall meets the water quality standards of the downstream state without first concluding that the quality of the river water five miles further downstream will be measurably improved. For example, the Pueblo's arsenic standard for the Rio Grande is three orders of magnitude (1000 times) more stringent that the federal Safe Drinking Water Standard, and is below the concentration that can be accurately measured by current laboratory equipment. EPA will impose this stringent limit on the City despite the fact that arsenic occurs naturally in Albuquerque's ground water at relatively high levels and is not discharged to the water by industrial polluters. If pure water is discharged at the City's outfall, it is possible that the arsenic levels in water flowing through the Pueblo will remain relatively high. I raise this issue of the agency's apparent inconsistency because it is one I find troubling. However, it relates to the issuance of a NPDES permit, and it is not a question that this court has jurisdiction to address.

## CONCLUSION

I find that EPA followed the necessary procedural steps in accepting Isleta Pueblo's proposed water quality standards. I also find that the agency decision was made after consideration of all the relevant factors and was neither arbitrary, capricious nor an abuse of discretion. The agency acted in accordance with the law and its decision is supported by substantial evidence in the administrative record. The City's motion for summary judgment is denied. The EPA's motion for summary judgment is granted.

**IT IS SO ORDERED.**