**INDIANA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT,**
**Appellant (Defendant below),**

v.

**TWIN EAGLE LLC, Appellee**
**(Plaintiff below).**

No. 49S00–0204–CV–237.

Supreme Court of Indiana.

Sept. 23, 2003.

Steve Carter, Attorney General of Indiana, Steven D. Griffin, Deputy Attorney General, Indianapolis, IN, Attorney for Appellant.

David C. Van Gilder, Indiana Division, Izaak Walton League of America, Inc.; National Wildlife Federation; Save the Dunes Council, Inc.; Save the Dunes Conservation Fund, Inc.; Hoosier Environmental Council, Inc.; Cedar Creek Wildlife Project, Inc. Fort Wayne, IN, Attorneys for Amici Curiae.

George M. Plews, Sue A. Shadley, S. Curtis Devoe, Stephen A. Studer, John H. Lloyd, IV, South Bend, IN, Attorneys for Appellee.

Larry J. Kane, Indiana Builders Association, Inc., Mark J. Thornburg, Indiana Farm Bureau, Inc., Indianapolis, IN, Attorneys for Amici Curiae.

### ON MOTION TO TRANSFER PURSUANT TO APPELLATE RULE 56(a)

BOEHM, Justice.

The federal Clean Water Act ("CWA") prohibits "the discharge of any pollutant" into "waters of the United States" without a permit. Similarly, Indiana state environmental law generally requires a permit to discharge pollutants into "waters of the state." Ind. Admin. Code tit. 327, r. 5–2–2 (2001). Twin Eagle, the plaintiff here, seeks to undertake a project that would put dredged and fill material in certain wetlands and waters on a site in Allen County, Indiana. This material is a "pollutant" as the term is used in the CWA and Indiana environmental regulations. The parties disagree whether a state permit may be required for those waters that are not waters of the United States. We hold that the Indiana Department of Environmental Management ("IDEM") may require permits for dredged and fill materials under its existing rules. We also conclude that discharges into private ponds and isolated waters may be regulated under some circumstances, and that IDEM's interim process for permitting dredged and fill material is not the product of invalid rulemaking. Whether the facts justify the regulation of these waters is an issue for the agency to resolve in the first instance.

### The Regulatory Framework and Factual and Procedural History

The National Pollutant Discharge Elimination System ("NPDES") is the centerpiece of CWA permits. 2 William H. Rodgers, Jr., *Environmental Law: Air and Water*, § 4.26 at 372 (1986). Although most discharges are governed by the NPDES permit process, the CWA provides for permits for discharges of dredged and fill material to be issued under a "Section 404 Program" administered by the Army Corps of Engineers. 33 U.S.C. § 1344 (2001); 33 C.F.R. 323.6 (2003). A state may also receive EPA approval to administer its own NPDES program to issue permits for waters within the state. 33 U.S.C. § 1342(b); 40 C.F.R. §§ 123.1–123.64 (1998). In 1975, the EPA approved Indiana's NPDES program. Although the CWA also allows state administration of a Section 404 program, 33 U.S.C. § 1344(g),[1] Indiana has not sought permission to issue permits under that program.

Until recently, IDEM considered all waters of the state that were regulated through the federal Clean Water Act Sec-

---

1. The process begins with a wetland delineation by the Corps of Engineers which identifies the waters subject to the jurisdiction of the CWA. If the waters are subject to federal regulation the Corps then determines whether the permit itself should be granted. The state still must certify the permit to ensure that the activity complies with state water quality standards. 33 U.S.C. § 1341(d) (2001). In essence, this gives the state the power to veto any Section 404 permit.

tion 404 program to be "waters of the United States" subject to the CWA. As a result, the federal Section 404 program regulated all dredged and fill material in all waters. For that reason, IDEM enacted no regulations of its own governing the discharge of dredged and fill material. In 2001, however, the United States Supreme Court held, in *Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) ("*SWANCC*"), that waters are "waters of the United States" for purposes of the CWA only if they are either navigable or tributaries of or wetlands adjacent to navigable waterways. *Id.* at 171, 174, 121 S.Ct. 675.[2] As a practical matter, construction projects affecting many ponds and wetlands were no longer subject to federal regulation, and the federal Section 404 program was no longer available to grant permits that would bring the projects into compliance with state law. IDEM attempted to fill the resulting gap in the state's regulation of dredged and fill materials by a series of memoranda stating its intention, until new rules were approved, to regulate waters of the state no longer subject to federal jurisdiction through an "interim regulatory process" whereby it would apply its state NPDES permitting process to applications for permits for dredged and fill material.

■ It is clear the federal law does not prevent a state from having a broader or more stringent regulatory program than the CWA imposes. *See e.g. EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 218, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976); *United States Steel Corp. v. Train*, 556 F.2d 822, 830 (7th Cir.1977); *City of Albuquerque v. Browner*, 865 F.Supp. 733, 739 (D.N.M.1993). Indeed, *SWANCC* itself referred to "the State's traditional and primary power over land and water use." *SWANCC*, 531 U.S. at 174, 121 S.Ct. 675. The issues here are whether Indiana statutes authorize IDEM to take its announced steps.

Twin Eagle plans to construct a residential development on approximately 460 acres of property it owns in Fort Wayne, Indiana. Approximately 21.52 acres of the property consist of ponds and wetlands. In March 2001, Twin Eagle hired a private contractor to perform a wetland delineation, a process which identifies the boundary, size and type of each body of water or wetland on the property. The delineation, which was approved by the United States Army Corps of Engineers on June 13, 2001, determined that 14.75 of the 21.52 acres are wetlands and private ponds that, under *SWANCC*, are not subject to the CWA. Twin Eagle's plans called for filling in much of these 14.75 acres, and this would require a permit if the state regulatory scheme applies to these waters.

On July 26, 2001, Twin Eagle sought a declaratory judgment to prevent IDEM from enforcing state environmental laws against the project. IDEM responded with a motion to dismiss for lack of subject matter jurisdiction, citing a lack of case or controversy and the failure of Twin Eagle to exhaust administrative remedies. Both parties filed motions for summary judgment. The trial court granted Twin Ea-

---

**2.** There is some disagreement as to the sweep of *SWANCC's* contraction of federal jurisdiction. Most federal courts have found it as described above in the text of this opinion, but some have concluded that any hydrological connection to navigable waters is sufficient for federal jurisdiction. *See generally FD & P Enters., Inc. v. United States Army Corps of Eng'rs*, 239 F. Supp 2d 509, 513–15 (D.N.J.2003) (discussing federal cases). This issue is irrelevant for our purposes because to the extent Twin Eagle's property remains subject to federal jurisdiction after *SWANCC*, it remains subject to the Indiana permitting process.

gle's motion and held: (1) Indiana state environmental laws gave IDEM no NPDES regulatory authority over private ponds or isolated wetlands that are not "waters of the United States" and could not require an NPDES permit for activities affecting those waters; (2) whether or not IDEM could regulate some waters not subject to the CWA, Indiana statutes gave IDEM no jurisdiction over private ponds and isolated wetlands; (3) IDEM could not bring an enforcement action for the discharge of fill material into waters that are not waters of the United States; and (4) IDEM's interim regulatory process constitutes an invalid attempt at rulemaking without complying with required procedures. We granted IDEM's petition to transfer under Appellate Rule 56(A) and now reverse the court's grant of summary judgment to Twin Eagle.

## I. The Trial Court's Subject Matter Jurisdiction

IDEM asserts that the trial court lacked subject matter jurisdiction because no actual controversy exists until IDEM resolves whether the waters on the site are subject to regulation, and also because Twin Eagle has not exhausted its administrative remedies. Twin Eagle counters that its claims raise pure questions of law challenging the authority of the agency to regulate the subject matter. Specifically, Twin Eagle contends these waters are private ponds and isolated wetlands over which Indiana law gives IDEM no jurisdiction. Twin Eagle also contends that in any event Indiana's jurisdiction over fills regulated by the Section 404 process is coextensive with CWA jurisdiction which, under SWANCC, does not extend to these waters. Third, Twin Eagle argues that IDEM's attempt to assume jurisdiction through its interim process did not follow the statutory requirements for rulemaking by an administrative agency.

### A. Ripeness for Declaratory Judgment

██ The Declaratory Judgments Act is to be "liberally construed," Indiana Code section 34–14–1–12 (1998), and allows for an interested party "whose rights, status, or other legal relations are affected by a statute ... [to] have determined any question of construction or validity arising under the ... statute ... and obtain a declaration of rights, status, or other legal relations thereunder." Ind.Code § 34–14–1–2 (1998). IDEM claims that the trial court lacked subject matter jurisdiction because there was neither an actual controversy nor the ripening seeds of a controversy. Specifically, IDEM argues that because it has made no determination concerning whether the waters at issue are within its regulatory jurisdiction, Twin Eagle presents a "hypothetical case" inappropriate for a declaratory judgment. We disagree. Although the Indiana state courts are not subject to a constitutional requirement of a case or controversy similar to that imposed by Article III of the federal constitution, *Cincinnati Ins. Co. v. Wills*, 717 N.E.2d 151, 154 n. 2 (Ind.1999), the Declaratory Judgments Act requires a justiciable controversy or question. *Little Bev. Co. v. DePrez*, 777 N.E.2d 74, 83 (Ind. Ct.App.2002). The controversy requirement is met when a case presents the "ripening seeds" of a controversy. *Id.* We have long taken the view that "where ... the claims of the several parties in interest, while not having reached that active stage, are nevertheless present, and indicative of threatened litigation in the immediate future, which seems unavoidable, the ripening seeds of a controversy appear." *Owen v. Fletcher Sav. & Trust Bldg. Co.*, 189 N.E. 173, 177, 99 Ind.App. 365, 374 (1934) (citations omitted). Twin Eagle has challenged the validity of a process which affects its ability to discharge dredged and fill materials on its property. The validity of the interim process, not merely its ulti-

mate outcome, is one major issue in this litigation, and in Twin Eagle's ability to use its property as it wishes. Even if the administrative process may be resolved in favor of Twin Eagle, Twin Eagle's claim, if valid, could obviate the need to go through the process. As such, the claim presents a genuine controversy that was properly brought to the trial court. Therefore, Twin Eagle's challenge of the validity of the interim process was proper under the Declaratory Judgments Act.

### B. *The General Requirement to Exhaust Administrative Remedies*

We have repeatedly emphasized the value of completing administrative proceedings before resorting to judicial review. *State Bd. of Tax Comm'rs v. Montgomery,* 730 N.E.2d 680, 684 (Ind.2000) (quoting *State v. Sproles,* 672 N.E.2d 1353, 1358 (Ind.1996)). The reasons for this requirement are well established: (1) premature litigation may be avoided; (2) an adequate record for judicial review may be compiled; and (3) agencies retain the opportunity and autonomy to correct their own errors. Even if the ground of the complaint is the unconstitutionality of the statute, which may be beyond the agency's power to resolve, exhaustion of administrative remedies may still be required because administrative action may resolve the case on other grounds without confronting broader legal issues. *Turner v. City of Evansville,* 740 N.E.2d 860, 862 (Ind.2001); *Austin Lakes Joint Venture v. Avon Utils., Inc.,* 648 N.E.2d 641, 644 (Ind.1995); *Sproles,* 672 N.E.2d at 1358. Ordinarily, an administrative agency must resolve factual issues before the trial court acquires subject matter jurisdiction. *Turner,* 740 N.E.2d at 862. But exhaustion of administrative remedies is not required if a statute is void on its face, and it may not be appropriate if an agency's action is challenged as being ultra vires and void. *Id.* More generally, if an action is brought upon the theory that the agency lacks the jurisdiction to act in a particular area, exhaustion of remedies is not required. Frank E. Cooper, *State Administrative Law* 577 (1965). To the extent the issue turns on statutory construction, whether an agency possesses jurisdiction over a matter is a question of law for the courts. *State ex rel. Paynter v. Marion County Superior Court, Room No. 5,* 264 Ind. 345, 350, 344 N.E.2d 846, 849 (1976).

The issues presented by this case can be summarized as: (1) does IDEM have the authority to regulate "waters of the state" previously regulated by the Section 404 program; (2) if IDEM is so authorized, can it properly exercise that authority through the NPDES permitting process; (3) if IDEM does have the authority to prohibit a discharge without an NPDES permit as to some waters, does that authority extend to discharges into private ponds and isolated wetlands in general and these waters in particular.

We agree with Twin Eagle that its challenge to IDEM's authority to apply the NPDES program to dredged and fill permits does not require exhaustion of remedies because at least the first two of these issues turn on issues of law. IDEM either does or does not have the legislative authority to regulate introduction of dredged and fill materials into waters that are not waters of the United States. Similarly, if the waters are subject to regulation, IDEM either is or is not authorized to apply the NPDES permitting system. Whether ponds and isolated wetlands are subject to regulation is a matter of construction of a statutory exemption from the grant of regulatory authority over "waters." Finally, Twin Eagle claims the absence of an approved state administered Section 404 program precludes IDEM

from acting. All of these issues are pure issues of law.[3]

For the reasons explained below, we resolve these abstract issues of law in favor of IDEM's ability to apply the interim process to waters of the state no longer subject to federal regulation. Assuming any waters on Twin Eagle's land are indeed "private ponds" and "isolated wetlands," as explained below, if a discharge from a pond threatens to cause pollution of other waters, IDEM may regulate even a private pond. I.C. § 13–11–2–265 (2002). Twin Eagle may be correct that the particular waters at issue are not subject to regulation, but the proper forum to address this fact sensitive issue is through the administrative process. We therefore defer to the administrative process to determine whether potentially dispositive factual circumstances exist here. I.C. § 13–11–2–265(a); *Turner*, 740 N.E.2d at 862.

## II. IDEM's Authority to Regulate the Waters at Issue

 IDEM seeks to apply the state's NPDES permit process to discharges previously regulated by the federal Section 404 program. This presents at least these issues: (1) whether IDEM has statutory authority to regulate waters that are not waters of the United States; (2) whether Indiana law gives IDEM regulatory powers over "private ponds" or "isolated wetlands" or both; and (3) if so, whether the NPDES permitting system is authorized to be employed.

### A. Waters of the State That Are Not "Waters of the United States"

Indiana environmental laws give IDEM the power to regulate discharges into "waters of the state." I.C. § 13–18–4–3 (1998). This statutory authority does not derive from federal legislation and no federal law purports to restrict the state's regulation of the type of waters at issue here. Nor, by its terms, does the Indiana statute limit its reach to waters within the scope of the CWA. Indeed, long before the enactment of the CWA, IDEM and its predecessors had jurisdiction over all the waters of the state except those specifically excluded by statute. 1935 Ind. Acts 537 (the agency had "jurisdiction to control and prevent pollution in the waters of this state . . . .").

IDEM's current statutory authority can be traced back to 1935, when the General Assembly authorized the Indiana Department of Commerce and Industry to regulate waters. *Id.* The state also has a long history of regulating waters through the Water Pollution Control Board (the "Board"). Created in 1943 through its predecessor, the Stream Pollution Control Board, the Board's primary purpose is to adopt rules regarding water pollution. I.C. §§ 13–18–4–3 and –4 (1998). In 1972, the federal Clean Water Act was passed. 33 U.S.C. §§ 1251 *et seq.* The Indiana legislature later created IDEM, and constituted it as the Indiana state agency to implement the CWA. I.C. § 13–13–5–1. The Board is now one of six agencies that operate under IDEM's umbrella but with separate and distinct statutory authority. The Water Pollution Control Board in particular is assigned the duties of adopting rules "for the control and prevention of pollution" in Indiana's waters. I.C. § 13–18–3–1.

Twin Eagle cites what is now codified at Indiana Code section 13–18–3–2(a) (2002),

---

3. Neither party argues that the effect of an invalid permitting process would be to leave Twin Eagle with a proposal prohibited by the general prohibition against discharge but no means of obtaining a permit. We assume, without deciding, that a valid permitting process is required for IDEM to assert regulatory powers over the proposal.

which authorizes IDEM to adopt rules "necessary" to the implementation of the CWA, and contends that only waters subject to the federal law are within IDEM's rulemaking power. We do not regard this as a jurisdictional confinement of the waters to be regulated to those subject to the CWA. In any event, it is not the only authorizing statute. Several other provisions of Indiana law authorize IDEM to issue regulations without regard to the CWA or any other federal law. Specifically, "[t]he board may adopt rules restricting the polluting content of any waste material and polluting substances discharged or sought to be discharged into any of the streams or waters of Indiana." I.C. § 13–18–4–3 (1998). In addition, the Board "shall adopt rules for the control and prevention of pollution ... that is deleterious to the public health ... or by which ... any fish life or beneficial animal or vegetable life may be destroyed...." I.C. § 13–18–3–1. And IDEM's commissioner may "take appropriate steps to prevent any pollution that is determined to be unreasonable and against public interests...." I.C. § 13–18–4–4. That is what IDEM has done by issuing the interim regulations. Twin Eagle notes the more recently added authority under Indiana state law to adopt regulations to implement the CWA. I.C. § 13–18–3–2. We think this was intended to make clear the state agency was empowered to proceed under federal law, but in no way curtailed its preexisting authority.

Among the rules adopted pursuant to these authorizations is the requirement that "[a]ny discharge of pollutants into waters of the state" requires an NPDES permit unless it is specifically excluded. 327 I.A.C. 5–2–2. The reach of the rule is unaffected by the choice of Congress to limit federal legislation or by any constitutional constraints on federal jurisdiction. Thus, when *SWANCC* curbed previously expansive views of the reach of the CWA, IDEM's scope of authority did not shrink. To the contrary, as the Supreme Court expressly noted, *SWANCC* had no effect whatever on the scope of waters subject to state regulation. *SWANCC*, 531 U.S. at 174, 121 S.Ct. 675. In short, Twin Eagle would have been required to get state water approval through the water certification process before *SWANCC*, albeit pursuant to a federal, not a state, law. The contraction of federal authority did nothing to limit state power.

### B. *Private Ponds and Wetlands*

■ Although Indiana is not precluded from regulating waters beyond federal regulatory reach, the issue remains whether the legislature has given IDEM authority over the waters at issue. To do that, it is not sufficient that IDEM have the authority to regulate some waters beyond the post-*SWANCC* reach of the CWA. It must also have the statutory authority to regulate "private ponds" or "isolated wetlands" or both, and must be able to reach the particular waters at issue here. Indiana Code section 13–11–2–265 defines "waters" as:

(1) the accumulations of water, surface and underground, natural and artificial, public and private; or

(2) a part of the accumulations of water; that are wholly or partially within, flow through, or border upon Indiana.

I.C. § 13–11–2–265 (2002). However, "the term 'waters' does not include a private pond ... unless the discharge from the pond ... causes or threatens to cause water pollution." *Id.* A private pond is a body of water wholly upon the land of a single owner or group of owners and not connected with any public waters of the state. *Trowbridge v. Torabi*, 693 N.E.2d 622, 627 (Ind.Ct.App.1998); I.C. § 13–11–2–265. Whether Twin Eagle's project in-

volves ponds within this definition, and if so whether their discharge causes or threatens pollution are fact issues for administrative determination in the first instance.

"Wetlands" also raise factual issues. The term has no statutory definition and the only definition of that term applicable to the Water Pollution Control Board in the statutes and rules defines wetlands as "those areas that are inundated or saturated by surface water or ground water at a frequency and duration to support and that, under normal circumstances, do support a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include the following: (1) Swamps. (2) Marshes. (3) Bogs. (4) Similar areas." 327 I.A.C. 6.1–2–62 (dealing with industrial waste).[4] *See also Family Dev. Ltd. v. Steuben County,* 749 N.E.2d 1243 (Ind.Ct.App.2001) (dealing with regulation of pre-*SWANCC* federal wetlands). Moreover, wetlands by their very nature vary in the amount of water they contain at a given time, and their boundaries can change depending on the season and the weather. But their outer boundaries are ascertainable, so the mere difficulty in determining what constitutes a wetland does not remove it from IDEM's jurisdiction. Nor do the characteristics of wetlands automatically remove them from of "waters of the state" if the statutory definition of "waters," includes "the accumulations of water ... or ... a part of the accumulations." I.C. § 13–11–2–265. So defined, at least some wetlands can be waters of the state.

Finally, presumably in response to the regulatory gap created by *SWANCC,* in March 2002 the General Assembly enacted Public Law 183, which states that a state agency may not "adopt or amend an administrative rule ... that concerns the definition of 'wetlands' or 'isolated wetlands'...." 2002 Ind. Acts 183 Sec. 2. In the absence of any general definition of "isolated wetland," it remains for case-by-case determination whether a particular site does or does not include "waters of the state" within the general regulatory power of IDEM under I.C. § 13–18–4–4, –5 (1998). Whether the wetlands on Twin Eagle's project meet that definition is again a question for the administrative process to resolve. Twin Eagle has at least two options if it believes its project will not affect regulated waters. It can apply for an NPDES permit, and challenge the finding if it believes it to be erroneous. Or, if Twin Eagle is sufficiently confident that its project will not violate the Act, it may proceed and risk an enforcement action by IDEM. This may leave a somewhat unsatisfactory legal framework, but we see no alternative to individualized determinations of IDEM's jurisdiction given the statutory prohibition against rulemaking.

## C. *The Interim Process*

 Even if IDEM has statutory authority to regulate the waters at issue, the issue remains whether the interim process is lawfully imposed. It is well established that administrative agencies may make reasonable rules and regulations to apply and enforce legislative enactments. *Ind. Dep't of Envtl. Mgmt. v. AMAX, Inc.,* 529 N.E.2d 1209, 1212 (Ind.App.1988); *Podgor v. Ind. Univ.* 178 Ind.App. 245, 250, 381 N.E.2d 1274, 1278 (1978). But IDEM may regulate by a new rule only if the proper rulemaking procedures have been followed. Thus, in establishing rules, the agency must comply with the Indiana Administrative Orders and Procedures

---

4. Other definitions relate to Solid Waste Disposal, flood plain management, and lake construction activities, and some seem to assume a pre-*SWANCC* view of federal jurisdiction. See 312 I.A.C. 10–2–44 (Supp.2002), 312 I.A.C. 11–2–24, and 329 I.A.C. 10–2–207.

Act, Indiana Code chapter 4–22–2, which includes provisions for public hearings and review by executive branch officials. By contrast, agency actions that result in resolutions or directives that relate solely to internal policy, procedure, or organization, and do not have the effect of law, are not subject to the same requirements. I.C. § 4–22–2–13(c)(1) (1998); *AMAX, Inc.*, 529 N.E.2d at 1212. The validity of the interim regulatory process turns on whether it constituted a new rule when IDEM applied the NPDES permit process to waters of the state previously, but no longer, subject to the federal Section 404 program. IDEM does not assert that it followed rulemaking procedures in announcing the "interim process." Rather it contends that requiring state NPDES permits for dredge and fill after *SWANCC* is not a new rule at all and is therefore not subject to the statutory requirements for adopting new rules. A rule is defined by Indiana Code section 4–22–2–3 as:

[T]he whole or any part of an agency statement of general applicability that:

(1) [H]as or is designed to have the effect of law; and

(2) [I]mplements, interprets, or prescribes:

(A) Law or policy; or

(B) The organization, procedure, or practice requirements of an agency.

I.C. § 4–22–2–3.

We conclude that Twin Eagle's claim that a new rulemaking procedure was required turns on an incorrect view of Indiana's regulatory framework. Indiana Administrative Code title 327 rule 5–2–2 requires an NPDES permit to be issued for "[a]ny discharge of pollutants into waters of the state," subject to certain exceptions. The exception relevant here is found at 327 I.A.C. 5–2–4, which provides an exemption from the permitting process for:

(2) Discharges of dredged or fill material into waters of the state and regulated under Section 404 of the CWA, except where the commissioner determines, on a case-by-case basis that such a discharge threatens to violate state water quality standards concerning toxic pollutants.

327 I.A.C. 5–2–4(2). The effect of withdrawal of the federal program from these waters is to remove Twin Eagle's from those "regulated under Section 404 of the CWA." Thus, by its terms, this regulation no longer provides an exception and leaves Twin Eagle subject to the general prohibition against discharge without an NPDES permit. The interim process is simply the application of a preexisting process to transactions that were previously thought to be exempt, but are no longer exempt because they no longer meet the federal requirements for the exemption.

Twin Eagle also challenges IDEM's authority to regulate its waters because it reads this rule as allowing the commissioner to make case-by-case decisions only when toxic pollutants are at issue. Twin Eagle asserts that the exclusion concerns only situations where a discharge of pollutants into CWA waters is threatened. We do not agree. The effect of the cited language is to permit the state to add requirements to a federally permitted project, not to exempt it. The section is labeled "exclusions" and lists those activities that do not require a permit. The first sentence of section 2 excepts state waters regulated under the CWA. Because the waters at issue are, for purposes of this case in its current procedural posture, state waters outside the scope of the CWA, they do not meet this exception and require an NPDES permit under the rule. Therefore this rule would encompass the exact situation we have here: regulation of waters potentially within IDEM's jurisdiction but outside the boundaries of the

CWA. The effect of *SWANCC* was thus to remove Twin Eagle's project from eligibility for the exception provided by Indiana Administrative Code title 327 rule 5–2–4(2). As such, no rulemaking is involved by applying the previously existing NPDES process to the no longer exempt discharge.

Twin Eagle notes that IDEM announced an intent to adopt a new rule to deal with post-*SWANCC* permits for isolated wetlands. Twin Eagle reasons from this that the interim process required a rulemaking exercise. But IDEM's desire to adopt a new rule does not imply that there is no regulatory scheme in place after the evaporation of the exemption for Section 404 permits. Adopting a new rule is fully consistent with the notion that, like the Section 404 program for waters of the United States, a different program may be appropriate for isolated wetlands that are waters of the state. In the meantime, however, the NPDES program is in place and there is no exemption.

Finally, Twin Eagle points out that the Water Pollution Control Board, not IDEM's commissioner, has the authority under Indiana Code sections 13–14–8–1, –2 to adopt rules regarding the waters at issue and that, even if the interim regulatory process is otherwise valid, IDEM usurped this authority. This contention proceeds from the assumption that the interim process involved a rulemaking exercise. Because we reject that premise, the argument falls with it.

### Conclusion

The trial court had subject matter jurisdiction over the declaratory judgment action. IDEM is within its statutory authority to require NPDES permits for the discharge of fill material into waters of the state previously regulated under the Section 404 program. Private ponds, when the discharges from these ponds cause or threaten to cause water pollution, and some isolated wetlands are waters of the state. We leave it to the regulatory process to determine in the first instance whether permits are required and, if so, should be issued in this case. We remand to the trial court with directions to enter a declaratory judgment consistent with this opinion.

DICKSON and RUCKER, JJ., concur.

SULLIVAN, J., concurs in result with separate opinion in which SHEPARD, C.J., joins.

SULLIVAN, Justice, concurring in result.

In this case, IDEM asks us not to reach the merits on the ground that Twin Eagle has not exhausted its administrative remedies. Indeed, IDEM has not even determined whether the waters on Twin Eagle's property are subject to regulation. I agree with IDEM's position and would hold that the trial court should have dismissed Twin Eagle's complaint for lack of subject matter jurisdiction.

The Court rejects IDEM's argument and proceeds to the merits. But Twin Eagle's victory on this issue turns out to be Pyrrhic because the Court resolves the merits in IDEM's favor.

Given this result, Twin Eagle might well second-guess its decision to litigate first. If Twin Eagle had successfully persuaded IDEM not to regulate (or if IDEM had decided not to prosecute had Twin Eagle proceeded without applying for a permit), Twin Eagle would not have received the unwelcome news the Court delivers to it today. One can envision a wide range of other compromises between IDEM and Twin Eagle more favorable to Twin Eagle than today's decision.

Our decisions are replete with reasons supporting the doctrine of exhaustion of remedies. *See, e.g., State Bd. of Tax Comm'rs v. Ispat Inland, Inc.,* 784 N.E.2d 477, 482–83 (Ind.2003); *Fratus v. Marion Cmty. Schs. Bd. of Trs.,* 749 N.E.2d 40, 46–47 (Ind.2001); *Town Council of New Harmony v. Parker,* 726 N.E.2d 1217, 1224 (Ind.2000), *am. on reh'g on other grounds,* 737 N.E.2d 719 (Ind.2000); *Austin Lakes Joint Venture v. Avon Utils., Inc.,* 648 N.E.2d 641, 644–45 (Ind.1995). The result of today's case illustrates one not often given—the doctrine's benefit to the party (arguably) subject to a regulatory agency's jurisdiction. Running the administrative gauntlet first provides such a party a much greater range of options and compromises than does litigation alone.

SHEPARD, C.J., joins.