**FOR PUBLICATION**



ATTORNEYS FOR APPELLANTS:

**E. SEAN GRIGGS**
**FREDRIC P. ANDES**
**DAVID T. BALLARD**
Barnes & Thornburg, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE INDIANA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**FRANCES BARROW**
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE CITY OF HOBART:

**JOSEPH P. ALLEGRETTI**
Dyer, Indiana

**ADAM J. SEDIA**
Rubino, Ruman, Crosmer, Smith, Sersic & Polen
Dyer, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CITY OF GARY AND GARY SANITATION, DISTRICT, | ) | |
| Appellants, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1106-MI-553 |
| | ) | |
| INDIANA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT and CITY OF HOBART | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable David J. Certo, Judge
Cause No. 49F12-1002-MI-007318

**May 17, 2012**

**OPINION FOR PUBLICATION**

**MATHIAS, Judge**

The City of Gary and the Gary Sanitation District (collectively "Gary") appeal the Marion Superior Court's order affirming the order of the Office of Environmental Adjudication, which upheld the Indiana Department of Environmental Management's ("IDEM") decision to issue a permit to the City of Hobart to operate a new wastewater treatment plant. Gary appeals and raises several issues, which we consolidate into the following two:

> I. Whether IDEM's interpretation of 327 Indiana Administrative Code section 5-2-11.7 is reasonable; and,

> II. Whether IDEM's decision to issue the permit was arbitrary, capricious, and otherwise not in accordance with the law or is unsupported by substantial evidence.

We affirm.

**Facts and Procedural History**

The City of Hobart's wastewater is currently treated both at Gary's wastewater treatment facility and at its own, aging Nob Hill wastewater treatment facility. Hobart pays Gary for its use of Gary's facility. Hobart's Nob Hill facility discharges into a

tributary of the Deep River and consistently struggles to stay within its permit limits. Deep River is an impaired water source for mercury.

Gary utilizes a collection system of stormwater and sanitary sewers that are combined in part. The system is designed with a number of combined sewer overflows which routinely discharge untreated wastewater into the Grand Calumet and Little Calumet rivers during wet weather. Both rivers are tributaries to Lake Michigan, as is the Deep River.

On some date prior to April 1, 2004, Hobart requested a permit to construct a new 4.8 million gallon per day wastewater treatment plant. The proposed plant would allow it to shut down the Nob Hill facility and disconnect from the Gary facility. On April 1, 2004, IDEM issued the requested National Pollutant Discharge Elimination System Permit ("the Hobart permit")[1] granting Hobart permission to operate a new wastewater treatment plant to be constructed along the Deep River.

The permitted mercury limits for the proposed Hobart facility are a daily maximum limit of 3.2 parts per trillion ("ppt") and a monthly average of 1.3 ppt per day. These limits are substantially less than the limits currently permitted at the Gary facility. Because the new Hobart facility will not utilize combined sewer overflows, it would completely avoid the discharge of untreated sewage.

---

[1] "The Federal Clean Water Act ("CWA") prohibits 'the discharge of any pollutant' into 'waters of the United States' without a permit. Similarly, Indiana state environmental law generally requires a permit to discharge pollutants into 'waters of the state.'" Ind. Dept. of Envtl. Mgmt. v. Twin Eagle, LLC, 798 N.E.2d 839 (Ind. 2003) (citing 327 Ind. Admin. Code 5–2–2 (2001) ("Any discharge of pollutants into waters of the state as a point source discharge, . . . is prohibited unless in conformity with a valid NPDES permit obtained prior to the discharge.").

3

Shortly after IDEM issued a permit for the construction of the Hobart facility, Gary filed a petition for administrative review of the Hobart permit with the Indiana Office of Environmental Adjudication. On January 19, 2010, the environmental law judge issued its findings of fact, conclusions of law, and final order in favor of IDEM and Hobart. The environmental law judge concluded that the mercury discharge limits in the Hobart permit would result in an overall improvement in water quality, and IDEM's decision to issue the permit complied with applicable law.

Gary then filed a verified petition for judicial review in Marion Superior Court. After briefing and oral argument, the trial court issued its findings of fact and conclusions of law on March 26, 2011. As is noted in the trial court's findings and conclusions, the paramount issue in this case is the parties' interpretation of IDEM's antidegradation requirement for outstanding state resource waters ("OSRWs")[2] found in 327 Indiana Administrative Code 5-2-11.7(a)(2):

> (2) For a new or increased discharge of a pollutant or pollutant parameter from a new or existing Great Lakes discharger into a tributary of an OSRW for which a new or increased permit limit would be required:
> (A) section 11.3(a) and 11.3(b) of this rule (327 IAC 5-2-11.3) apply to the new or increased discharge of a pollutant or pollutant parameter into the tributary; and
> (B) the discharge shall not cause a significant lowering of water quality in the OSRW.
> (C) The requirements of this subdivision will be considered to have been met when:
> (i) one (1) or more of the items listed in section 11.3(b)(1)(C)(i), 11.3(b)(1)(C)(ii), 11.3(b)(1)(C)(iii)(BB), 11.3(b)(1)(C)(iii)(FF), or 11.3(b)(1)(C)(iii)(II) of this rule (327 IAC 5-2-11.3) apply; or
> (ii) all three (3) of the following are met:

---

[2] Lake Michigan is classified as an OSRW.

(AA) one (1) or more of the subitems in section 11.3(b)(1)(C)(iii)(AA), 11.3(b)(1)(C)(iii)(CC),11.3(b)(1)(C)(iii)(EE),11.3(b)(1)(C)(iii)(GG), 11.3(b)(1)(C)(iii)(HH), or 11.3(b)(1)(C)(iii)(LL) of this rule (327 IAC 5-2-11.3) apply;
(BB) the applicant demonstrates that the increase is necessary; and
(CC) the public notice requirements in subsection (c)(6) are met; or
(iii) all four (4) of the following are met:
(AA) one (1) or more of the subitems in section 11.3(b)(1)(C)(iii)(DD),11.3(b)(1)(C)(iii)(JJ), or 11.3(b)(1)(C)(iii)(KK) of this rule (327 IAC 5-2-11.3) apply;
(BB) the applicant demonstrates that the increase is necessary;
(CC) the applicant demonstrates that it will result in a net environmental improvement; and
(DD) the public notice requirements in subsection (c)(6) are met.
(D) As used in this subdivision, "tributary of an OSRW" includes the upstream segments of a receiving waterbody when some or all of the downstream segments of the receiving waterbody are designated as an OSRW.

Throughout these proceedings, Gary has argued that subsections 11.7(a)(2)(A), (B), and (C) must be read in the conjunctive, but IDEM and Hobart have argued that clause 2(C) should be read independently of 2(A) and (B).

The trial court affirmed the environmental law judge's final order, and in doing so, issued its own conclusions of law concerning the parties' interpretations of the regulation. Specifically, the court concluded:

12. 327 IAC 5-2-11.7(a)(2) is written to ensure that the water quality of an OSRW is maintained and protected by applying certain requirements on new or increased discharges into the tributary of the OSRW. It states that for such discharges for which a new or increased permit limit would be required, clauses (A) and (B) will apply.
13. The "and" between (A) and (B) clearly reflects that for such discharges for which a new permit limit would be required both (A) and (B) will apply.

5

There is no "and" connecting clauses (C) and (D) to clauses (A) and (B). Therefore, clauses (C) and (D) must be read independently of (A) and (B).

14. 327 IAC 5-2-11.7(a)(2)(C) simply states that the requirements of subdivision (2) will be considered met by the items listed in clause (C). The items in clause (C) are not the exclusive means for meeting the requirements of subdivision (2). Clause (C) refers to subdivision (2), not to clause (B).

15. IDEM and the [Environmental Law Judge] interpreted subdivision (2) to mean that a new discharge into a tributary of an OSRW for which a new permit limit would be required will have to satisfy clauses (A) and (B), or it can satisfy this rule by meeting the requirements listed in clause (C). The rule does not preclude IDEM from granting a new permit limit if clauses (A) and (B) are met independent of the items listed in clause (C).

16. The [Environmental Law Judge] reasonably concluded that the express language of 327 IAC 5-2-11.7(a)(2)(C) supports IDEM's interpretation. Clause (C) is stated in clear and unambiguous terms. Those terms do not state that clause (C) is the exclusive means by which to determine that 327 IAC 5-2-11.7(a)(2) is met but that satisfying clause (C) is one way to meet the rule requirements.

17. The [Environmental Law Judge] reasonably concluded that Gary's "interpretation of 327 IAC 5-2-11.7(a)(2) would require stricter requirements for discharge into an OSRW tributary than for discharge directly into an OSRW, contrary to the express, clear terms of the applicable regulations . . . ."

Appellant's App. pp. 13-14.

The trial court also concluded that the Environmental Law Judge reasonably found that the new wastewater treatment plant authorized in the Hobart Permit would comply with more stringent standards than those limits established in the permit governing the operation of the Gary facility as it processes its own wastewater and that of Hobart. And the new Hobart wastewater treatment plant will divert Hobart's raw sewage away from Gary's combined system, thereby preventing the release of Hobart's raw sewage in the effluent that Gary currently discharges during wet weather. Both the Environmental Law Judge and the trial court ultimately concluded that Hobart's construction of a new

6

wastewater treatment plant will result in significant overall environmental benefit to Lake Michigan. Therefore, the trial court affirmed the Final Order of the Office of Environmental Adjudication, and Gary now appeals. Additional facts will be provided as necessary.

**Standard of Review**

Gary argues that the trial court erroneously affirmed IDEM's decision to issue the Hobart Permit. The Administrative Orders and Procedures Act governs judicial review of an administrative action and is the exclusive means for judicial review of an agency action. Ind. Code § 4-21.5-5-1. A trial court may provide relief from an administrative decision only if the agency action is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. I.C. § 4-21.5-5-14. Importantly, our court grants "'deference to the administrative agency's findings of fact, [but] no such deference is accorded to the agency's conclusions of law.'" Soames v. Ind. Dep't of Natural Res., 934 N.E.2d 1154, 1158 (Ind. Ct. App. 2010), trans. denied (quoting LTV Steel Co. v. Griffin, 730 N.E.2d 1251, 1257 (Ind. 2000)).

**I. Interpreting 327 Indiana Administrative Code section 5-2-11.7(a)(2)**

When we interpret administrative regulations, our court applies the same rules of construction that apply to statutes. Dev. Servs. Alts., Inc. v. Ind. Family & Social Servs. Admin., 915 N.E.2d 169, 181 (Ind. Ct. App. 2009), trans. denied.

An interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself . . . . Deference to an agency's interpretation of a statute becomes a consideration when a statute is ambiguous and susceptible of more than one reasonable interpretation. When a court is faced with two reasonable interpretations of a statute, one of which is supplied by an administrative agency charged with enforcing the statute, the court should defer to the agency. **If a court determines that an agency's interpretation is reasonable, it should terminate its analysis and not address the reasonableness of the other party's proposed interpretation.** Terminating the analysis recognizes the general policies of acknowledging the expertise of agencies empowered to interpret and enforce statutes and increasing public reliance on agency interpretations. However, an agency's incorrect interpretation of a statute is entitled to no weight. If an agency misconstrues a statute, there is no reasonable basis for the agency's ultimate action and the trial court is required to reverse the agency's action as being arbitrary and capricious.

Id. (quoting Pierce v. Ind. Dep't of Correction, 885 N.E.2d 77, 89 (Ind. Ct. App. 2008))

(citations and quotation marks omitted and emphasis added).

The threshold issue in this case is whether IDEM reasonably interpreted the antidegradation requirement for OSRWs found in 327 Indiana Administrative Code 5-2-11.7(a)(2):

(2) For a new or increased discharge of a pollutant or pollutant parameter from a new or existing Great Lakes discharger into a tributary of an OSRW for which a new or increased permit limit would be required:
(A) section 11.3(a) and 11.3(b) of this rule (327 IAC 5-2-11.3) apply to the new or increased discharge of a pollutant or pollutant parameter into the tributary; and
(B) the discharge shall not cause a significant lowering of water quality in the OSRW.
(C) The requirements of this subdivision will be considered to have been met when:
(i) one (1) or more of the items listed in section 11.3(b)(1)(C)(i), 11.3(b)(1)(C)(ii), 11.3(b)(1)(C)(iii)(BB), 11.3(b)(1)(C)(iii)(FF), or 11.3(b)(1)(C)(iii)(II) of this rule (327 IAC 5-2-11.3) apply; or
(ii) all three (3) of the following are met:

8

(AA) one (1) or more of the subitems in section 11.3(b)(1)(C)(iii)(AA), 11.3(b)(1)(C)(iii)(CC),11.3(b)(1)(C)(iii)(EE),11.3(b)(1)(C)(iii)(GG), 11.3(b)(1)(C)(iii)(HH), or 11.3(b)(1)(C)(iii)(LL) of this rule (327 IAC 5-2-11.3) apply;

(BB) the applicant demonstrates that the increase is necessary; and

(CC) the public notice requirements in subsection (c)(6) are met; or

(iii) all four (4) of the following are met:

(AA) one (1) or more of the subitems in section 11.3(b)(1)(C)(iii)(DD),11.3(b)(1)(C)(iii)(JJ), or 11.3(b)(1)(C)(iii)(KK) of this rule (327 IAC 5-2-11.3) apply;

(BB) the applicant demonstrates that the increase is necessary;

(CC) the applicant demonstrates that it will result in a net environmental improvement; and

(DD) the public notice requirements in subsection (c)(6) are met.

(D) As used in this subdivision, "tributary of an OSRW" includes the upstream segments of a receiving waterbody when some or all of the downstream segments of the receiving waterbody are designated as an OSRW.

When IDEM issued the Hobart Permit, it applied only subsections 11.7(a)(2)(A) and (B) and determined that the Hobart Permit met those requirements. IDEM declined to apply subsection 11.7(a)(2)(C) and argues that clause (C) should be read independently of clauses 2(A) and (B). Under IDEM's interpretation of the regulation, satisfying clause (C) is simply one of two ways to meet the regulation's requirements.

IDEM's interpretation is consistent with the plain language of the regulation. Clauses (A) and (B) are connected by an "and." Therefore, a "new or increased discharge of a pollutant" for which a new or increased permit limit would be required must comply with both clauses (A) and (B) of the regulation if applied. There is no

9

conjunctive language connecting clauses (A) and (B) to clause (C). And clause (C)'s opening phrase, i.e. "[t]he requirements of this subdivision will be considered to have been met when," implies that the requirements of the subdivision may be satisfied by other means particularly in the absence of any language stating that clause (C) is the exclusive means to determine whether the requirements of subdivision 11.7(a)(2) are met.

In addition, in this particular case, the antidegradation factors cited in clause (C) do not apply to the Hobart Permit's mercury discharges. Clause (C) cites to antidegradation factors listed in 327 Indiana Administrative Code 5-2-11.3(b). But section 11.3(b) applies only to "high quality waters that are not designated as an" OSRW. Because the Deep River is not a "high quality water" to begin with, due to existing levels of mercury pollution, section 11.3(b) is inapplicable to the Hobart Permit. Because the requirements of subdivision 11.7(a)(2)(C) can only be satisfied by applying the specifically cited antidegradation factors enumerated in section 11.3(b), it would be impossible to apply clause (C) to the Hobart Permit. Therefore, it was reasonable for IDEM to conclude that it could satisfy subdivision 11.7(a)(2) by meeting the requirements of clauses (A) and (B) in its consideration of whether to award the Hobart Permit.

Ultimately, IDEM concluded that it must, at a minimum, satisfy subdivision 11.7(a)(2) by meeting the requirements of clauses (A) and (B) **or** by meeting the requirements in clause (C). Because we conclude that IDEM's interpretation of 327 Indiana Administrative Code 5-2-11.7(a)(2) is reasonable, we conclude our analysis and

10

need not address the reasonableness of Gary's proposed interpretation.  See Dev. Servs. Alts., Inc., 915 N.E.2d at 181.

## II. The Hobart Permit

Gary also argues that even if IDEM's interpretation of 327 Indiana Administrative Code subdivision 5-2-11.7(a)(2) is reasonable, its decision to issue the Hobart Permit "violated antidegradation regulations" and "will cause a significant lowering of water quality" in violation of 327 Indiana Administrative Code sections 5-2-11.3(a) and 5-2-11.7(a)(2).  Appellant's Br. at 30, 35.  Specifically, Gary argues that its own permitted mercury discharges into an OSRW remain unchanged, and therefore, once Hobart begins discharging mercury from its new wastewater treatment plant "there will be a significant increase of permitted mercury discharges into Lake Michigan[.]"  Id. at 30.

Before we specifically consider Gary's argument, we observe that, within the language at issue, "degradation" means:

> (1) With respect to an outstanding national resource water, any new or increased discharge of a pollutant or a pollutant parameter, except for a short term, temporary increase.
> (2) With respect to an outstanding state resource water, any new or increased discharge of a pollutant or pollutant parameter that results in a significant lowering of water quality for that pollutant or pollutant parameter, unless:
>> (A) the activity causing the increased discharge:
>>> (i) results in an overall improvement in water quality in the outstanding state resource water; and
>>> (ii) meets the applicable requirements of 327 IAC 2-1-2(1) and (2) and 327 IAC 2-1.5-4(a) and (b)[.]

11

Ind. Code § 13-11-2-50.5 (2009). Moreover, the Water Pollution Control Board[3] is

required to promulgate rule procedures that will "prevent degradation" and

> allow for increases and additions in pollutant loadings from an existing or
> new discharge if:
> (A) there will be an overall improvement in water quality for the
> outstanding state resource water as described in this section; and
> (B) the applicable requirements of 327 IAC 2-1-2(1) and 327 IAC 2-
> 1-2(2) and 327 IAC 2-1.5-4(a) and 327 IAC 2-1.5-4(b) are met.

I.C. § 13-18-3-2(k) (2009).

A. *327 Indiana Administrative Code section 5-2-11.3(a)*

Consistent with these statutory mandates, in its issuance of the Hobart Permit,

IDEM was required to comply with the regulations set forth in 327 Indiana

Administrative Code section 5-2-11.3(a) and (b) and establish that the new discharge

would "not cause a significant lowering of water quality in the OSRW." See 327 I.A.C. §

5-2-11.7. As we noted above, section 5-2-11.3(b) applies only to "high quality waters

that are not designated as an outstanding state resource water." Due to existing levels of

mercury pollution, the Deep River, which empties into an OSRW, is not considered a

high quality water. Therefore, only subsection 11.3(a) applies to our consideration of the

Hobart Permit.

327 Indiana Administrative Code section 5-2-11.3(a) applies to all waters in the

Great Lakes system[4] and provides in pertinent part:

---

[3] The Water Pollution Control Board operates under IDEM's umbrella but "with separate and distinct statutory authority. The [Board] in particular is assigned the duties of adopting rules 'for the control and prevention of pollution' in Indiana's waters." Twin Eagle, 798 N.E.2d at 845 (citing I.C. § 13-18-3-1).

[4] Indiana's antidegradation policy, which is partially implemented by 327 Indiana Administrative Code section 5-2-11.3, provides:

the commissioner shall ensure that the level of water quality necessary to protect existing uses is maintained. In order to achieve this requirement, and consistent with 40 CFR 131.10, water quality standards use designations must include all existing uses. Controls shall be established as necessary on point and nonpoint sources of pollutants to ensure that the criteria applicable to the designated use are achieved in the water and that any designated use of a downstream water is protected. Where water quality does not support the designated uses of a waterbody or ambient pollutant concentrations are greater than water quality criteria applicable to that waterbody, the commissioner shall not allow a lowering of water quality for the pollutant or pollutants that prevents the attainment of such uses or the water quality criterion.

The environmental law judge specifically found that IDEM's determination that the Hobart Permit met regulations enumerated in 327 Indiana Administrative Code section 5-2-11.3(a) was supported by the guidance provided by the Environmental Protection Agency ("EPA") for new discharges into an impaired water in that agency's Supplementary Information Document.

> IDEM interpreted 327 IAC 5-2-11.3(a)'s "lowering of water quality" in conformation with [the] EPA's view that a wasteload allocation set equal to the most stringent criterion applied "end-of-pipe" is permissible. "End-of-pipe" criteria provide no mixing zone for dilution, will contain a lower concentration of the pollutant than the receiving water, and will thus not increase a waterway's pollutant concentration, if not cause the concentration to decrease.

Appellant's App. p. 289.

---

For all surface waters of the state within the Great Lakes system, existing instream water uses and the level of water quality necessary to protect existing uses shall be maintained and protected. Where designated uses of the waterbody are impaired, there shall be no lowering of the water quality with respect to the pollutant or pollutants that are causing the impairment.

327 I.A.C. § 2-1.5-4(a).

13

The environmental law judge's finding is consistent with the EPA's Water Quality Guidance for the Great Lakes System: Supplementary Information Document (hereinafter "the SID"). Specifically, the SID provides in pertinent part:

> . . . [The] EPA believes that limiting discharges from point sources to criteria end-of-pipe is nonetheless appropriate in these circumstances, as discussed below.
>
> Numeric criteria are concentration-based standards designed to protect the aquatic ecosystem and humans from the adverse affects of pollutant discharges that would occur at levels above the criteria. Where the background level of the pollutant in the receiving water is greater than the criteria, the stream is in non-attainment and the aquatic environment or human health is adversely impacted. A point source discharging at criteria end-of-pipe in such situations, however, will contain a lower concentration of the pollutant than the receiving water, and therefore will not increase the pollutant concentration in the waterway. Such a discharge may, in fact, cause the ultimate pollutant concentration in the receiving water to decrease. Where the environmental effects of a pollutant on the aquatic ecosystem or on human health are associated with the concentration of the pollutant in the waterway, limiting discharges from point sources to criteria end-of-pipe in these circumstances should therefore result in no further degradation of the waterbody, and may in fact improve the water quality of the waterbody. . . . The Agency therefore believes that establishing limits on point sources under these circumstances at criteria end-of-pipe is consistent with the underlying environmental objectives of the [Clean Water Act].

Id. at 107.

Although the SID also states that "special environmental considerations are present with regard to bioaccumulative [persistent] compounds," which would include mercury discharges, the EPA has authorized the permitting authority to "require more stringent limitations than criteria end-of-pipe in order to provide a requisite level of protection" Id. Gary argues therefore that "IDEM should have considered additional means to limit new mass discharges of BCCs into an impaired waterbody such as Deep River, but failed to do so in this case." Appellant's Br. at 39. But there is no evidence in

14

the record establishing whether there were "additional means" available to IDEM to limit new mass discharges of mercury into the Deep River. And in the SID, the EPA does not require the permitting authority to apply further limitations to address mass loading, but leaves that decision to the permitting authority's discretion. Appellant's App. p. 107. Therefore, although IDEM could have imposed an end-of-pipe limit more stringent than the 1.3 ppt wildlife criterion to specifically address mercury as a bioaccumulative chemical of concern, it was not explicitly required to do so.

IDEM's decision to issue the Hobart Permit with an end-of-pipe limit of 1.3 ppt wildlife criterion is consistent with the guidance provided by the EPA in the SID because applying the stringent end-of-pipe criteria for measuring mercury concentrations will result in the addition of mercury to the Deep River at a concentration lower than that of the receiving water.[5] For all of these reasons we conclude that the limits established in the Hobart Permit will not lower the water quality in the Deep River, and therefore does not run afoul of section 5-1-11.3(a).

B. *327 Indiana Administrative Code section 5-2-11.7(a)(2)(B)*

Gary also argues that "the new mercury discharge allowed under the Hobart Permit will cause a significant lowering of water quality in violation of" the anti-

---

[5] Gary argues that the section of the SID discussed above does not support IDEM's arguments "because that section does not relate to antidegradation." Appellant's Br. at 37. Contrary to Gary's assertion, application of that section of the SID is relevant to determining whether the new discharge of mercury into the Deep River will result in a significant lowering of water quality. Because the environmental law judge correctly determined that issuance of the Hobart Permit will not result in a lowering of water quality, but will result in a significant overall environmental benefit, an antidegradation analysis is not required. Only section 5-2-11.3(b) requires an anti-degradation analysis before an action causing a "significant lowering of water quality occurs." But as we have previously held, section 11.3(b) does not apply in the case before us.

15

degradation rule enumerated in 327 Indiana Administrative Code section 5-2-11.7(a)(2)(B). See Appellant's Br. at 32.

> (2) For a new or increased discharge of a pollutant or pollutant parameter from a new or existing Great Lakes discharger into a tributary of an OSRW for which a new or increased permit limit would be required: . . . (B) the discharge shall not cause a significant lowering of water quality in the OSRW.

To determine whether issuance of the Hobart Permit violates section 11.7(a)(2)(B), IDEM applied its 1998 Nonrule Policy Document,[6] which provides guidance as to what constitutes a "significant lowering of water quality." The document states in pertinent part:

> A new or increased discharge into a tributary of Lake Michigan will not cause a significant lowering of water quality in Lake Michigan if any of the following are met: . . . The new or increased discharge into a tributary of Lake Michigan is the result of an activity that will result in a significant overall environmental benefit to Lake Michigan.

Appellant's App. p. 305.

With this standard in mind, IDEM presented evidence that the new discharge of mercury was the result of an activity that would result in a significant overall environmental benefit to Lake Michigan. First, we observe that the Hobart Permit's effluent limits for mercury are lower than the existing or ambient levels of mercury in the waterbody. Further, IDEM and the City of Hobart established that the new wastewater treatment plant will treat mercury discharge significantly more effectively than it is

---

[6] We reject Gary's argument that the Nonrule Policy document was no longer valid after 327 Indiana Administrative Code 5-2-11.7(a) was amended to add clause 5-2-11.7(a)(2)(C). IDEM's use of the document was proper as its contents were superseded only to the extent that it conflicts with 11.7(a)(2)(C), which IDEM appropriately did not apply in its decision to issue the Hobart Permit.

16

currently treated at Hobart's aging Nob Hill plant or at the Gary wastewater treatment plant.

We may reasonably assume, absent contrary evidence in the record, that Gary's mercury discharges will decrease when Hobart's sewage is no longer treated at Gary's wastewater facility. But Gary suggests that it might add new sources of wastewater after it ceases treating Hobart's wastewater. Gary correctly observes that if Gary continues to discharge mercury at its current permit limits, i.e. a monthly average of 30 ppt, the additional mercury discharge allowed from the Hobart wastewater treatment plant will increase the amount of mercury discharged into the OSRW, i.e. Lake Michigan. This would result in a lowering a water quality, but only as it pertains to the amount of mercury discharged into the OSRW and its tributaries.

Even though Gary may continue to discharge mercury at its current permit limits, the environmental law judge concluded that the Hobart Permit will result in significant overall environmental benefit to the OSRW, and the evidence supports that conclusion. In addition to treating mercury discharge more effectively, construction of Hobart's new wastewater treatment facility will allow the city to close the Nob Hill wastewater treatment plant, a facility that has consistently not met its permit obligations.[7] And

---

[7] Gary argues that IDEM's argument concerning the closure of the Nob Hill facility was a post hoc agency rationalization because IDEM "did not raise this reasoning in support of the Hobart Permit at the time of its issuance." Appellant's Br. at 33. We disagree. Closure of the Nob Hill facility was referenced in the Hobart Permit. Appellant's App. p. 155. Further, IDEM necessarily discussed the benefits of closing the Nob Hill facility before the Environmental Law Judge because her findings of facts and conclusions of law specifically discuss the Nob Hill facility, and its closure and accompanying beneficial environmental impact are cited as reasons for sustaining IDEM's decision to issue the permit. For these reasons, we conclude that citing the closure of the Nob Hill facility to support IDEM's decision to issue the permit was not a post hoc agency rationalization. See Dev. Servs. Alts., Inc., 915 N.E.2d at 184

Hobart's raw sewage will no longer utilize Gary's combined sewer overflows, which will avoid the discharge of untreated sewage during wet weather. The discharge of untreated sewage releases pollutants such as mercury, E. Coli, copper, and ammonia-nitrogen into the waterways. The issued permit will require the new Hobart wastewater treatment plant to apply more stringent standards when treating sewage than the standards in effect at Gary's facility.

## Conclusion

We conclude that IDEM's decision to issue the Hobart Permit was neither arbitrary nor capricious, and that the decision was in accordance with the law and supported by substantial evidence. First, IDEM's interpretation of 327 Indiana Administrative Code section 5-2-11.7(a)(2) was reasonable in that it only required Hobart to comply with subdivision 11.7(a)(2)(A) and (B), but not 11.7(a)(2)(C), in its decision to issue the Hobart Permit. And, although the Hobart Permit allows a new source for discharge of mercury, because Hobart will be able to close its non-compliant Nob Hill Plant and treat its wastewater more effectively than it is currently treated by Gary's facility, the Hobart Permit will result in an overall environmental benefit to and will not cause a significant lowering of water quality in Lake Michigan and its tributary, the Deep River. Therefore, IDEM's decision to issue the Hobart Permit does not violate the regulations set forth in 327 Indiana Administrative Code sections 5-2-11.3(a) and 11.7(a)(2)(A) and (B).

---

(stating "that it is the reviewing court, and not the administrative agency, that is barred from considering post hoc rationalizations").

18

Affirmed.

FRIEDLANDER, J., and RILEY, J., concur.